THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARY ANN BALINT, Appellant.

First Department, March 31, 1983

### APPEARANCES OF COUNSEL

*Chester L. Mirsky* and *Katherine K. Hudson* for appellant.

*Julie Copeland* of counsel (*Amyjane Rettew* and *Allen Sullivan* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

BLOOM, J.

Defendant, a 40-year-old registered nurse was charged with the murder of her fiancé, Victor Eckes. Prior to trial she moved to suppress statements made by her to the police and certain physical evidence. The hearing court denied her motion. Thereafter, she pleaded guilty to manslaughter in the first degree. We are of the opinion that the statements made by defendant and the gun, the location of which was indicated in her statement, and which she actively assisted the police in finding, should have been suppressed. Accordingly, we reverse the conviction and remand the case for a new trial.

On May 16, 1980, at or about 5:45 o'clock in the evening Detective Hildebrandt was approached by a couple who informed him that someone had just been shot in Fort Tryon Park. The two witnesses told him that they had observed a white female with blond hair, wearing a white dress and light coat and carrying a large black bag, fleeing from the scene of the shooting. Hildebrandt repaired to the park where he saw a man, later identified as Eckes, sitting on a park bench, with two bullet wounds, one in the head and one in the chest.

Hildebrandt immediately called for assistance and, at about 6:00 P.M. he was joined by Detective Serpa and Police Officer Montuori. Serpa questioned four witnesses. From them he received substantially the same information which had been imparted to Hildebrandt. A search of the area disclosed two .38 cartridges, one live and one spent, in the vicinity of the bench upon which the victim had been found.

At about 7:30 P.M. Serpa was notified that a white female had appeared at the precinct at about 7:15 and had reported a shooting in Fort Tryon Park. Approximately 20 minutes later Serpa returned to the station house where he met defendant. He began to question her about the murder. Defendant told him that the victim was her fiancé; that she and the deceased were sitting on a park bench when a black man emerged from the bushes carrying a radio in one hand and a gun in the other. According to defendant, the black man, without uttering a word, fired two shots at point-blank range and fled. Defendant, unnerved by the incident, ran home, changed from her nurse's uniform into street clothes and took her dog out for a walk. Upon again returning to her home she left the dog there and went to the station house to report the shooting.

During the initial interrogation of defendant by Serpa, he dispatched Detective Hildebrandt and Police Office Montuori to defendant's home to verify that she lived there together with her mother and to check whether the story related by defendant to Serpa coincided with such information as she may have divulged to her mother. This occurred sometime between 8:30 and 9:00 P.M. Despite the apparent absurdity of her story, she was, at this point, no more than

a suspect. Objectively viewed, although she may not have been free to leave the precinct there was not yet enough evidence to warrant an arrest.

The events leading to the examination of the handbag allegedly used in common by defendant and her mother are described in detail in the opinion of our brother SANDLER. Following this "consensual" examination by Police Officer Montuori, Montuori telephoned Serpa and notified him of the finding of a bullet in the purse of the same caliber as that used in the slaying. By this time approximately two and one-half hours had elapsed between initiation of the interrogation of defendant by Serpa, which had continued intermittently during that period, and the receipt of the phone call from Montuori. Serpa conveyed to defendant the information about the finding of a bullet which had been related by Montuori and then left her alone. He returned shortly and continued the conversation. When this conversation had continued for approximately an hour without any appreciable results, Serpa suggested that she call her mother. By this time defendant had become more than a suspect. At about 11:00 P.M. defendant called her mother. When the call was made the finding of the bullet in the purse was confirmed. Shortly thereafter defendant made the statement which was the subject of the motion to suppress. Then and only then was defendant advised of her *Miranda* rights (*Miranda v Arizona,* 384 US 436).

After defendant had made her statement Serpa asked defendant what she had done with the gun. She responded that she had dropped it in a waste can, giving him the location of the can. Police were dispatched to pick up the weapon. However, they were unable to find it. At Serpa's request defendant led the police to the precise waste can in which she had disposed of the gun. There, it was recovered.

Whether or not the interrogation of defendant was custodial when first she related her story to Detective Serpa may be open to dispute. However, after the intermittent interrogation had continued for some two and one-half hours and Serpa had been notified that a bullet had been found in "our" handbag the conclusion is inescapable that, even without the formality of an arrest, defendant was in custody. The fact of custody ought not hinge on such

nebulous factors as police testimony that defendant "was free to leave" or on defendant's subjective reaction that she was not free to leave. It is to be determined on the basis of objective realities (*People v Yukl*, 25 NY2d 585; *People v Rodney P.*, 21 NY2d 1). Making due allowance for the deference which an appellate tribunal is required to give to the finding of the trier of the fact, we are, nevertheless, impelled to the conclusion that judged by that standard, defendant was in custody. While defendant's presence and interrogation in the police station does not, of itself, necessarily warrant a finding of custody (*People v Pugliese*, 26 NY2d 478) it is an element to be considered together with all other surrounding circumstances. When Serpa suggested to defendant, approximately one hour later, that she telephone her mother to confirm the finding of the bullet, he did so in anticipation that confirmation of that fact would lead to a confession. Judged by any objective standards defendant was no longer free to leave the station house. She was no longer a mere suspect. She was, in Serpa's eyes, already a defendant. All that was needed to close the case was a confession. The result confirmed Serpa's anticipation. Only then was defendant notified of her *Miranda* rights. Only then, after she had already spoken, was she informed that she had the constitutional right to remain silent; that anything she said might be used against her and of her right to counsel. In the circumstances presented, we are impelled to the conclusion that defendant's *Miranda* rights were violated. It follows therefrom that her confession should have been suppressed. Necessarily, therefore, the gun, the location of which was indicated in the confession and which thereafter was recovered with the active assistance of defendant, should, likewise, be suppressed as the fruit of the unlawfully extracted confession (*Wong Sun v United States*, 371 US 471).

Accordingly, the judgment of the Supreme Court, New York County (G. ROBERTS, J., at plea and sentence; McGINLEY, J., at the suppression hearing) rendered September 11, 1981 should be reversed, on the law and the facts, the motion to suppress the defendant's statements and gun granted, and the matter remanded for a new trial.

SANDLER, J. (concurring in part and dissenting in part). Although the issue seems to me a close one, I am in agreement with the court's determination that the defendant was in custody after she was informed that a bullet of the same caliber as those recovered at the scene of the homicide had been found in her pocketbook, and that accordingly her constitutional rights were violated when she was thereafter questioned without having been informed of her *Miranda* rights.

The leading New York authority on the issue is, of course, *People v Yukl* (25 NY2d 585). In *Yukl,* the court found the evidence sufficient to sustain the finding of the hearing court, which had been affirmed by the Appellate Division, that the defendant was not in custody prior to receiving the *Miranda* warnings. The rule was formulated in the following language (*supra,* p 589): "The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position."

I find the inference very strong that an innocent person in defendant's position, upon learning that a bullet matching those recovered at the scene of the homicide had been found in her pocketbook, would have understood that her status had been dramatically changed. Indeed, the information then communicated to the defendant is very similar to the discovery by the investigating police in *Yukl* (*supra*) of incriminating stains on his shorts and person, which led those police officers promptly to administer the *Miranda* warnings.

The strongest authority arguably to the contrary, and one understandably relied upon by the hearing court, is *Oregon v Mathiason* (429 US 492, 495). Although that decision leaves me with some lingering doubts, I have come to think that it may reasonably be distinguished on the ground that in that case the police officer's statement to the defendant that the officer believed him to be guilty of the crime followed immediately upon an explicit statement to the defendant that he was not under arrest, and that the defendant was in fact permitted to leave the station house after he had made incriminating statements.

In my opinion the defendant's constitutional rights were independently violated by the warrantless search in her home of her pocketbook, which led to the discovery of the bullet. This issue concerns the hearing court's determination that the People had proved by clear and convincing evidence that defendant's mother had made statements from which the investigating police officers could reasonably have concluded that she had apparent authority to consent to their examination of a certain pocketbook carried by the defendant at the time of the homicide.

The central problem, in my view a disquieting one, can be stated simply. On the face of it, the relevant police testimony invites doubt as to its trustworthiness and bears significant indicia of having been carefully tailored to meet a perceived constitutional requirement. Nonetheless, this testimony was accepted as credible by a hearing Judge who had the opportunity to observe all the witnesses directly, in this case a hearing Judge of large experience in criminal matters. Weighing carefully the deference due the factual findings of the hearing Judge against the inherent improbability of the police testimony, I have been unable to persuade myself that the factual finding is supported by credible evidence.

At about 6:00 P.M. on May 16, 1980 Detectives Serpa and Hildebrandt, and Police Officer Montuori, arrived at Fort Tryon Park in response to reports that a man had been shot. They saw the dead body of Vincent Eckes on a bench, shot once in the head and once in the chest. Witnesses reported that they observed a woman running from the area immediately after the shots were fired. The woman was described as white, with blond hair, wearing a white dress and light coat, and carrying a "large black bag". Sometime after 7:00 P.M. Detective Serpa was notified that a woman was at the police station reporting a shooting in the park. He returned to the precinct and met the defendant.

The defendant told the detective that the deceased was her fiancé and that she was sitting with him on a park bench when there emerged from behind bushes a black man, "holding a radio — a loud-playing radio in one hand, a gun in the other" who "approached the bench, and

without any further conversation fired two shots at the deceased." The defendant further said that she then got up, ran out of the park onto the street, and went home, where she had a brief conversation with her mother, changed her clothing, took her dog for a walk, returned home and then went to the police station.

Detective Serpa asked her what she thought was the motivation in view of the fact that no demand was made for money, and the defendant responded that "it possibly may have been a hit." Detective Serpa asked her if she would be willing to look at mug shots to see if she could identify the man and she agreed to do so.

While the defendant was looking at mug books, Detective Serpa asked Officer Montuori to go to defendant's home "to verify the address", which he said was his normal practice "uptown" with regard to "witnesses", and also to verify her statement "as to the time sequence, so on and so forth." Montuori in turn asked Detective Hildebrandt to accompany him.

At defendant's apartment the officers introduced themselves to her mother, Millie Slazinik, and asked Mrs. Slazinik what occurred when her daughter had come home. Defendant's mother reported that she had arrived home shaken and crying, and said that Vincent had been shot in the park and someone had chased her. Defendant changed her clothing, walked the dog, and then said she was going to the police station to report what had occurred.

The police asked if they could look at the clothing the defendant had worn. That clothing, including a nurse's uniform, disclosed apparent bloodstains.

Montuori testified that he saw a black handbag on the dining room table at which he and Hildebrandt were sitting with defendant's mother. He asked if it was the handbag that the defendant was carrying when she came home. He testified that defendant's mother said it was and then added: "But that is our handbag. We both have things in it. We both use it." Officer Montuori then asked if they could look at the contents of the bag, and defendant's mother agreed. She placed a white sweater on the table, removing what she described as "women's things" (appar-

ently tampons), and then dumped the contents of the bag on the white sweater. The officer observed, together with cosmetics, a live .38 caliber bullet, a bullet of the same caliber as one found at the scene of the homicide. He then called Detective Serpa to report what had been found, who in turn informed the defendant. It is clear that after the defendant confirmed in a telephone conversation with her mother the discovery of the bullet, she made the first of several admissions which eventually led to her assisting police in finding the gun, and to her signed consent for the police to secure the clothing that she had worn.

With minor variations Detective Hildebrandt's version of the conversation was similar. He testified that he "believed" Montuori asked the mother, "did she take the handbag with her to the precinct, and I believe the mother at that time said no, she was carrying our handbag, and pointed to a handbag"; that the handbag pointed to was large and black in color; that Montuori further questioned her as to what she meant by "our handbag" and that the mother replied, "We both use the handbag and we both have things in the handbag."

In testimony that was not on this issue the subject of any cross-examination by the District Attorney, the defendant testified that the handbag was hers, that her mother never used it, and that all of the contents in it belonged to her.

Defendant's mother denied having told the officer that the handbag belonged to both her daughter and herself. She testified that when the police asked if they could look into the handbag she said nothing, but pushed away what she described as "junk" from the table, and moved the pocketbook near Officer Montuori, who dipped his hand in the bag and said that he had found "the bullet that killed Vinnie."

Analysis of this conflicting testimony appropriately starts with the proposition, conceded by the District Attorney, that the officers could not have lawfully examined the contents of the bag consistent with the requirements of the Fourth Amendment to the Constitution in the absence of a warrant, which they did not have, or the consent of someone who had or reasonably appeared to have authority to

consent to the examination. (See *People v Adams,* 53 NY2d 1, 9, mot for rearg den 54 NY2d 832.) That the officers wanted to examine the contents of the bag is obvious. Indeed, although denied by all of the police witnesses, it appears almost certain that a central purpose of the police visit to defendant's apartment was to look into the "large black bag" that defendant had been seen carrying in the park.

Although it is unusual for two adult women to share the same bag, as the hearing court noted, I agree that this arrangement is not so inconceivable as by itself to require rejection of the police testimony. The problem of reliability is sharply raised by the fact that the answer found to have established the authority to consent was wholly unresponsive to the question put by Officer Montuori. The defendant's mother was not asked whether the bag in question belonged to the defendant. She was asked whether it was the bag the defendant was carrying. It is not easy to understand why she would have responded to that question by volunteering, as testified to by Montuori: "But that is our handbag. We both have things in it. We both use it."

In short, the testimony of the police officers requires us to believe that defendant's mother unresponsively volunteered information establishing an unusual relationship of ownership with regard to the bag, of precisely the kind that was necessary to justify the examination of the bag that occurred.

The credibility of the police account of the events leading to the discovery of the bullet is further impaired when considered in the light of Detective Serpa's testimony and the realities of the investigation as it had developed. Detective Serpa insisted repeatedly throughout his cross-examination that although he had a question in his mind as to certain aspects of the defendant's story, he did not consider her a suspect until after she had made her first admission. This testimony is simply not credible. Before interviewing defendant Detective Serpa had learned from witnesses of the flight from the area after the shots of a white woman with blond hair, dressed in white and carrying a large black bag. Defendant confirmed that she was that woman. It is not easy to accept that this experienced

detective found persuasive the defendant's wild story of a mysterious black (seen by no one else), with "a loud-playing radio in one hand, a gun in the other" who fired shots at her fiancé without any prior conversation or demand for money, in what she conjectured was possibly a "hit".

Any possible doubt that the detective may have entertained as to the untruthfulness of this bizarre account must surely have been dissipated by the defendant's report of her subsequent behavior. Although the defendant did not say that she knew that her boyfriend was dead when she ran out of the park or give any facts from which such a belief on her part could have been inferred, she did not return to the park to assist her fiancé, nor did she, a nurse, make any effort to secure medical assistance for him. It is not conceivable that an experienced police officer could have found so believable as to exclude the defendant from consideration as a prime suspect that an innocent person in her position would have gone home, changed her clothing, walked her dog, and only then, an hour or more after the shooting, gone to the station house to report the event.

The immediate reason for this persistent denial that defendant was a suspect is clear. Detective Serpa was concerned lest he be faulted for not having given the defendant *Miranda* warnings long before the defendant's first admission. But Detective Serpa's denial also served the function of concealing an important, most likely the principal, reason for dispatching Montuori and Hildebrandt to the apartment. Once it is accepted, as on any realistic view it must be, that the defendant was in fact the prime suspect from the moment she gave her absurd story to Serpa, it becomes apparent that the officers were sent to the apartment for reasons that neither Serpa nor they acknowledged, and which in fact all the police witnesses denied. The obvious, and appropriate, interest of the police was to find evidence to confirm the likelihood, indeed, the overwhelming probability, of defendant's guilt. Inevitably the most critical item of evidence which the police were concerned to find was the murder weapon. It must have been apparent to the police that the "large black bag" which the defendant was seen carrying during her flight

from the park might well have concealed the gun prior to as well as after the shooting, and that there was at least a possibility that the gun was still in the bag. In short, on any realistic view of the critical events, it is clear that a central reason for sending Montuori and Hildebrandt to the apartment was to examine the contents of the large black bag.

When the testimony relating to the events preceding the examination of the bag is considered in the light of the realities of the investigation, and the concerted effort of the police witnesses to conceal the purpose for the visit to defendant's apartment, it seems to me highly improbable that the defendant's mother inexplicably accommodated the police purpose by volunteering, in an unresponsive answer to a question, statements alleging an unusual arrangement with regard to the bag of precisely the kind necessary to permit the officers lawfully to look into the pocketbook at the time they did.

Accordingly, the judgment of the Supreme Court, New York County (GEORGE ROBERTS, J., on plea and sentence, and McGINLEY, J., at the suppression hearing) rendered September 11, 1981, convicting defendant upon her guilty plea of manslaughter in the first degree and sentencing her to an indeterminate prison term of from 5 to 15 years, should be reversed, the plea of guilty should be vacated, and the motion to suppress the defendant's statements and the physical evidence should be granted, and the case should be remanded for further proceedings.

MILONAS, J. (dissenting). In my opinion, the judgment being appealed herein should be affirmed.

Defendant Mary Ann Balint was indicted on July 3, 1980 for the crime of murder in the second degree. Thereafter, she moved to suppress certain physical evidence and statements which she had made to the police and the prosecutor. A hearing was conducted on February 27, March 4, 5, 6 and 9, 1981, and on May 29, 1981, in a written opinion, the court denied the motion in its entirety. Defendant subsequently pleaded guilty to manslaughter in the first degree in satisfaction of the charges in the indictment, receiving an indeterminate sentence of from 5 to 15 years. On

appeal, she challenges the propriety of the hearing court's ruling with regard to her motion to suppress.

At the suppression hearing, the People's version of the facts was as follows: At approximately 6:00 P.M. on May 6, 1980, Detectives Richard Serpa, Harry Hildebrandt, and Officer Joseph Montuori were notified that a man had been shot in Fort Tryon Park. Arriving at the scene, they found the dead body of Vincent Eckes lying on a bench. He had been shot once in the head and once in the chest. Nearby, the police located two spent .38 caliber bullet shells and one live .38 bullet round. Witnesses stated that they had observed a blond woman, who was dressed in white and carrying a handbag, running from the vicinity after the shooting. Shortly before 7:30 P.M., Detective Serpa was informed that there was a woman at the police station reporting a shooting in the park. He returned to the precinct and began discussing the incident in question with the woman, defendant Mary Ann Balint. The defendant asserted that she had been sitting on a bench with her fiancé, Vincent Eckes, when a black man, holding a loud-playing radio in one hand and a gun in the other, had approached and, without uttering a word, had fired two shots at Eckes, and then fled. The defendant had purportedly gotten up, had run out of the park and gone home. There she had changed her clothes, held a brief conversation with her mother and had walked her dog. This done, she had come to the police station.

The defendant agreed to examine some mug shots to determine if she could identify the alleged killer. Detective Serpa produced several books of photographs of black males. Although the defendant made various comments about certain physical characteristics of the men pictured resembling that of the shooter, she failed to pick out any of the mug shots. During this time, defendant, who was calm and composed, told Detective Serpa about her job and her relationship with Eckes. However, while defendant was looking through the photographs, Officer Montuori and Detective Hildebrandt were dispatched to her apartment to verify the address where she claimed that she lived with her mother, as well as her account of the events after she arrived home. The officers reached there at about 9:45 P.M.

They introduced themselves to defendant's mother, Millie Slazinik, advising her that they were investigating the shooting of Vincent Eckes and that the defendant was at the police station. Mrs. Slazinik invited them into the apartment, asked them to sit down and offered them some refreshments, which they declined.

Mrs. Slazinik related to them how her daughter had returned home, shaken and crying. The defendant had declared that Eckes had been shot in the park and that someone was chasing her. Then the defendant had left to walk her dog. When she had come back, she had explained to her mother that she was going to the police station. Officer Montuori inquired about the clothes which the defendant had been wearing. Mrs. Slazinik first described the clothing, then readily produced it. The defendant's white dress (nurse's uniform) and shoes had bloodstains on them. Noticing a black handbag on the dining room table, Officer Montuori asked Mrs. Slazinik if that was the bag which the defendant had with her earlier that day. According to both Detective Hildebrandt and Officer Montuori, Mrs. Slazinik replied that her daughter had been carrying the bag but that it was their joint property and contained personal articles belonging to each of them. When Officer Montuori requested permission to inspect the bag, she consented. However, she indicated her desire to first remove some "women's things". Withdrawing what appeared to be a tampon, she proceeded to empty the contents onto a white sweater which she had placed on the table. Among an assortment of cosmetics and other items, the officers retrieved a live .38 caliber bullet.

Officer Montuori telephoned Detective Serpa to convey news of the discovery. It was now around 10:00 P.M. Detective Serpa, relaying the information to defendant, solicited her reaction. For the next hour or so, during which time Detective Serpa's activities were not confined solely to speaking with the defendant, there were discussions concerning the bullet. Defendant offered a number of possible explanations for the way in which it ended up in her handbag, but she ultimately expressed her doubt about the find. Detective Serpa remarked that Mrs. Slazinik had been present when the bullet was located, proposing that

defendant call her mother for confirmation. Until this point, defendant had still not made any admissions. Accepting Detective Serpa's recommendation, defendant telephoned her mother and talked with her in a language unfamiliar to Detective Serpa. After the call was concluded, Detective Serpa asked the defendant, "Well, now that you know that I was telling you the truth, what now?" Thereupon, defendant, putting her head down, responded, "I'll tell you what happened. I did it, but first I want to see my mother." Detective Serpa then prepared to advise defendant of her *Miranda* rights, but she insisted that she be taken to her mother. Believing that there would be no further communication between himself and the defendant until she met with her mother, Detective Serpa summoned Officer Montuori back to the precinct to drive the defendant home. Detective Hildebrandt remained behind in the apartment with Mrs. Slazinik. At that point, all conversation regarding the death of Vincent Eckes had ceased. Detective Serpa and Officer Montuori escorted defendant to her house, where she spoke privately with her mother for approximately 15 to 20 minutes. They then returned to the station house, as did Detective Hildebrandt.

Detective Serpa brought the defendant to the same room in which she had previously been interviewed and informed her of her constitutional rights by reading them from a form. The defendant asserted that she understood her rights but indicated her willingness to make a statement. Only then did questioning of the defendant resume. She conceded having shot Eckes in the park after the deceased had made certain verbal threats to her, as well as brandished a knife at her. The entire interrogation, which lasted for about 45 minutes, was conducted in normal tones. Defendant also agreed to be interviewed by an Assistant District Attorney and to show the officers where she had disposed of the gun. Although an initial search for the weapon was unsuccessful, the gun was eventually recovered during a second attempt. In addition, the defendant signed a consent form permitting the police to retrieve her uniform and shoes from her apartment.

While the District Attorney was being awaited, Detective Hildebrandt happened to enter the office where the

defendant was sitting alone. The defendant inquired whether she ought to have a lawyer. Instead of replying, Detective Hildebrandt left the room and informed Detective Serpa of the defendant's remark. Detective Serpa went in and told the defendant that the prosecutor would be there soon and that she should discuss the matter of an attorney with him. Shortly thereafter, the District Attorney arrived at the precinct. Since this particular station house did not possess video taping facilities, the defendant was moved to one that did. The prosecutor again advised the defendant of her rights, specifically bringing her attention to her earlier inquiry about a lawyer. Defendant, however, declared that she understood her rights and was disposed to make a statement without the presence of counsel. She then reiterated in more detail the confession she had made to Detective Serpa.

The defense version of the facts, as recounted by the defendant and her mother at the hearing, differed in a number of significant respects from that provided by the police witnesses. However, the court, in denying the motion to suppress, found the officers' testimony to be credible and convincing beyond a reasonable doubt. According to the court, Mrs. Slazinik had freely and voluntarily consented to the officers' entry into the apartment and to their examination of the defendant's clothing and handbag. In the opinion of the court, the police contention regarding Mrs. Slazinik's assertion as to joint use of the bag was more credible than her claim that she informed the officers that the bag belonged to the defendant. The court reasoned that even if Mrs. Slazinik did not have actual authority to agree to a search of the bag, her apparent authority to do so was sufficient to support the discovery of the bullet.

As to the defendant's statements, the court held that the defendant was not in custody at the time that she exclaimed "I did it" after being advised that a bullet had been found in her handbag. The court noted that the defendant, who had come to the precinct voluntarily for the purpose of relating an exculpatory story about a fictitious black man, had herself initiated a concocted story, apparently intending to exonerate herself and mislead the police. She then agreed to Detective Serpa's request that she examine mug

shots, all the while continuing her deception and referring to this or that characteristic which the individual in the photograph had in common with the alleged killer. During this entire procedure, the defendant's encounter with the police was entirely consistent with a witness reporting a crime, was extremely cordial and without the least indication of being anything other than entirely voluntary on her part.

Not until around 10:00 P.M., when Detective Serpa received the telephone call from Officer Montuori concerning the discovery of the bullet, was there any basis for the defendant's being considered a suspect. Certainly, nothing in her account was inherently inconsistent with the facts as reported by the witnesses at the scene or the facts so far known to the police. While it may be true that after the call from Officer Montuori, the defendant's status changed from that of a witness to a possible suspect, this does not mean that she was thereby not free to leave and was, consequently, in custody. The existence of the bullet alone (and that was still the only proof against the defendant since her bloodstained clothes was compatible with her original version of what had happened) was not sufficient evidence upon which to detain her. Nor does the defendant's mere presence in a police station imply custody (*People v Pugliese,* 26 NY2d 478; and *People v Yukl,* 25 NY2d 585). The length of time during which she was at the precinct house, first as a witness and later as a suspect, can hardly be construed as transforming an otherwise noncustodial setting into a custodial one. (See *People v Korsing,* 71 AD2d 628.) In determining whether an individual was in custody prior to receiving his warnings, the standard is "not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position." (*People v Yukl, supra,* p 589.) Here, there is, in addition, nothing to indicate that the defendant did not actually feel herself at liberty to walk out of the police station at any time prior to her admission.

Moreover, the hearing court appropriately concluded that defendant did not invoke her right to counsel by asking Detective Hildebrandt whether she ought to have a

lawyer. When she made that inquiry, which was a request for advice rather than a clear and categorical demand for counsel (see *People v Mandrachio,* 79 AD2d 278, affd 55 NY2d 906) she was not undergoing any questioning. Subsequently, the District Attorney appeared and not only gave the defendant her *Miranda* rights but specifically raised the subject of her earlier statement about an attorney. The defendant, however, declared that she understood her rights and was willing to talk without a lawyer being present. Thus, there is ample support in the record for the court's finding that the defendant was not in custody when she made her first admission, that she was then adequately informed of her constitutional rights, that she knowingly and voluntarily waived her right to counsel and that, therefore, her statements, as well as the gun, should not be suppressed.

FEIN and ASCH, JJ., concur with BLOOM, J.; SANDLER, J. P., concurs in part and dissents in part in an opinion; MILONAS, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on September 11, 1981, reversed, on the law and the facts, the motion to suppress the defendant's statements and gun granted, and the matter remanded for a new trial.