■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ELLIS CENTANO, Also Known as ELLIS SAMMY CENTANO, Also Known as ELLIS S. CENTANO, Also Known as ELLIS CENTENO, Appellant.—Judgement, Supreme Court, New York County (Leon Becker, J., at hearing, trial and sentence), rendered July 9, 1987, which convicted defendant of manslaughter in the first degree and sentenced him to a prison term of 8⅓ to 25 years, is affirmed.

The issue is whether the circumstances of the police questioning of the defendant amounted to a custodial interrogation requiring the administration of *Miranda* warnings.

The facts are thoroughly presented in the dissent. Reviewing these facts objectively, it is clear that defendant was not subjected to a custodial interrogation.

To begin with, defendant's presence at the precinct was voluntary. When defendant learned that the police wished to interview all of the deceased's friends, defendant spoke with the detectives and made an appointment to see them on October 13th. When defendant failed to keep that appointment, the police did not go out searching for him or otherwise view him as a suspect. On the following day, the defendant unexpectedly and voluntarily presented himself at the police precinct. At that time, the initial questioning by both Detectives Allman and Jaffer concerned background information about the deceased and any relationship defendant may have had with him. Defendant was not treated as if he were in custody and he was expressly told that he was not a suspect. Similarly, when he took the first lie detector test, he was reminded that he was not a suspect, and he was told that he did not have to take a test.

When defendant returned to the precinct after that test, he was not restrained. He was driven back unhandcuffed and unescorted in the back of the car. Defendant was asked, rather than ordered, to return, and defendant stated that he had no problem with being asked further questions and "offered to cooperate because Ivory was a friend." At this point it was 3:30 P.M. Defendant was given food to eat, and he relaxed at the station house watching the Mets baseball playoff game on television. Questioning did not resume until 7:00 P.M., and then continued on and off until 11:00 P.M. when defendant gave the police a fabricated story about a man named "Tony" who supposedly killed Ivory. Even after the fruitless police

search for Tony, and defendant's eventual admission, at 2:00 A.M., that the Tony story was a "hoax", defendant was not treated differently. He was in no way restrained or otherwise placed in custody. He was given something to eat and, to avoid the long round trip to and from defendant's home in Newark, New Jersey, before the lie detector test scheduled for early the next morning, defendant agreed to remain overnight at the 26th Precinct where he was allowed to sleep alone in an unlocked room. On the way to the second lie detector test the next morning, defendant was not restrained and was allowed to go alone into a store to buy a soda and cigarettes.

After defendant failed the second lie detector test, he began to cry and told Detective Jaffer, "I got to tell you what really happened", and admitted that he fought with Ivory. Defendant became a suspect only at this time, and recognizing this change of circumstance, Detective Jaffer properly cut him off and did not resume questioning until after giving him *Miranda* warnings.

The well-established standard for determining whether a defendant was in custody is not subjective, but rather what a reasonable person, innocent of any crime, would have thought had he been in defendant's position. *(People v Yukl,* 25 NY2d 585.) Even an interview of extended duration at a police station is not necessarily a custodial interrogation, but the circumstances should be considered as a whole. *(Supra.)*

When viewed from the standard of a reasonable person who was innocent, it is clear that defendant's interrogation was not custodial. Initially, it must be emphasized that he appeared at the police precinct voluntarily and from the viewpoint of an innocent person aiding in the investigation of the death of a friend, the tenor of the questioning was not accusatory and defendant could not reasonably believe that he was in custody. Moreover, defendant was never handcuffed or otherwise physically restrained, and his freedom of action was not restricted by the authorities. *(People v Rodney P.,* 21 NY2d 1.)* The conduct of the police and the general atmosphere were not coercive. There was no continuous questioning and defendant was given frequent breaks during which he partook of several meals and spent time watching a long baseball game. Defendant at no time protested about the questioning and appeared eager to cooperate. Moreover, the questioning was investigative in nature, as opposed to accusatory or confrontational.

In this regard, the matter is analogous to *People v Bailey* (140 AD2d 356). In *Bailey,* the defendant knew the victim of a

homicide. In investigating the homicide, police went to the home of the defendant at 3:15 P.M. and asked him to accompany them to the precinct in Queens, which he did. There, defendant was interviewed regarding any knowledge he might have about the victim and the killing. When he failed to provide viable information, he was taken to the Police Academy in Manhattan and given two separate lie detector tests. Just as in the situation here, the tests revealed the defendant's answers to be deceptive. By 11:00 P.M. he was taken back to Queens, riding alone and unrestrained in the back seat of the police vehicle. At a point after they returned to the precinct, Bailey was given *Miranda* warnings and eventually confessed.

The Second Department found that the interrogation of Bailey was not custodial and reversed the granting of the motion to suppress his confession. In reaching this determination the court relied on many of the same factors that are present here—defendant's voluntary presence at the precinct, his eagerness to assist in the investigation of his friend's death, the lengthy and numerous breaks between questioning, the lack of physical restraint, and the noncoercive, nonconfrontational nature of the questioning. Based on all of these factors, it was held in *Bailey (supra)* that the interrogation was not custodial, notwithstanding its extended duration. Similar factors are even more strongly present here. Accordingly, despite the lengthy period of time that the defendant spent with the police, the record establishes that he was not subject to custodial interrogation prior to receiving the *Miranda* warnings and his confession should not be suppressed.

The cases cited in the dissent are clearly distinguishable and do not support a reversal in this case.

In *People v Anderson* (42 NY2d 35), the court held that police interrogation was custodial where defendant was confined in one room for 19 hours, subject to persistent, unrelenting hostile questioning, by eight or nine relay teams of detectives, while defendant was deprived of food, drink, and sleep, and isolated from family or friends.

In *People v Balint* (92 AD2d 348), defendant voluntarily appeared at the police station in connection with an investigation of her fiancé's death. However, 2½ hours later, other police officers discovered a bullet in her handbag at home, linking her to the killing. From that point on, the character of the interrogation changed since she had become a suspect and was not free to leave, and the police questioning deceptively

induced her to confess. It was because of the various additional factors, not present here, that this court held that the interrogation was custodial.

Since the defendant was not "in custody" up to the time that he told Jaffer he had had a fight with Ivory, and was promptly given *Miranda* warnings at that time, his subsequent voluntary confessions should not be suppressed. The hearing court correctly denied the suppression motion, and the judgment should be affirmed. Concur—Sullivan, Kassal and Ellerin, JJ.

Murphy, P. J., and Smith, J., dissent in a memorandum by Smith, J., as follows: The defendant's conviction should be reversed and a new trial ordered at which his oral, written and videotaped confessions are excluded. The evidence is incontrovertible that he was subjected to custodial interrogation without *Miranda* warnings. *(Miranda v Arizona,* 384 US 436 [1966].)

After learning that the police were looking for him in connection with a murder in Central Park in Manhattan, the 18-year-old defendant appeared at a police precinct. Over a period of some 29 hours before he confessed, he was continually questioned, given two lie detector examinations, confronted with the allegedly negative results of each, taken to the crime scene and permitted to sleep for approximately 2½ hours. It was only when the police began to give him a third polygraph examination that the defendant broke down, cried and began confessing to the crime. At that point the defendant was instructed to stop speaking and the *Miranda* warnings were given. While reasonable persons may dispute the point at which the police questioning became custodial, certainly when the defendant was told that he had flunked the first polygraph examination and the questioning continued, *Miranda* warnings should have been given.

A review of the facts will demonstrate the custodial questioning.

On October 1, 1986 at about 11:00 P.M. the body of Cecil Ivory was discovered in Central Park. The following day Detective Kenneth Allman spoke with Ricky Weston and Giles King, two friends of Ivory, who identified the defendant as another friend of the deceased. Allman asked Weston to tell the defendant to contact the police department. Detectives thereafter went to an address in New Jersey and canvassed the 14th Street area of New York County in an attempt to locate the defendant.

On or about October 13, 1986 Detective Allman spoke with the defendant by telephone and arranged for him to be interviewed at the Central Park Precinct. The defendant failed to keep the scheduled appointment but appeared at the precinct unexpectedly on October 14, 1986 at about 8:30 A.M.

Detective Allman questioned the defendant for approximately two hours regarding his relationship with Ivory and the identity of Ivory's other friends. The defendant told Allman that he had met Ivory at a picnic in Central Park and that he was at a bar on 14th Street with his friend on the evening of Ivory's death. Other detectives were dispatched to the 14th Street area in an attempt to confirm this information. At approximately 11:00 A.M. Allman concluded his interview of the defendant and asked the defendant if he would be willing to help out the investigation by submitting to further questioning with another detective. The defendant agreed and waited in Detective Allman's office while Allman performed other work. The defendant was not advised that he was free to leave.

At about 1:30 P.M. Detective Scott Jaffer arrived at the precinct and with Allman questioned the defendant for about one hour. The defendant stated that he was a homosexual prostitute who had had relations with both the deceased and Ricky Weston. The defendant was asked by Jaffer whether he had anything to do with Ivory's death and/or to account for his whereabouts on the evening of the homicide. The defendant denied having anything to do with Ivory's death, and again stated that he had been with his friend. The defendant told detectives that he had learned of Ivory's death in a telephone call from Ricky Weston.

The detectives then asked the defendant if he would take a polygraph test since "his story didn't check out." The detectives told the defendant that they thought he knew something about the murder which he was not telling them and explained the polygraph procedure. They told the defendant that if he had not been involved in the homicide, he had "nothing to worry about." The defendant agreed to take the test in order "to prove that he did not have anything to do with the killing." As of this time, the defendant had not been advised of his *Miranda* rights.

At about 2:30 P.M. the defendant was driven by Allman and Jaffer to the Polygraph Unit at the Police Academy. The defendant sat in the examination room while the examiner was given the background of the investigation and questions

were prepared. The examination was conducted over the course of one hour, after which the defendant was advised that he had failed. The defendant was told that the results did not indicate that he actually had committed the murder but only that he knew something about the crime.

The detectives then returned with the defendant to the Central Park Precinct at about 3:30 P.M. where again he was told that the testing indicated that he knew something about the crime. Defendant stated that he had "no problem" with being asked any further questions and "offered to cooperate because Ivory was a friend." The detectives gave the defendant a sandwich and soda which the defendant ate while watching a baseball game along with several officers.

Questioning of the defendant resumed at approximately 7:00 P.M. At one point the defendant indicated that he had received a telephone call from Ricky Weston about Ivory's death that caused him to feel that Weston was involved, but shortly thereafter he retracted this accusation. At another point the defendant asked to speak with a friend of his, but police efforts to contact this friend failed.

Questioning continued "off and on" until about 11:00 P.M. when Detective Jaffer accompanied the defendant to the bathroom. There, the defendant stated to Jaffer, "I just want to get it off my chest and tell you what's going on" and related a story about a man named Tony who he said killed Ivory. The defendant stated that Tony was also a homosexual prostitute with whom he had arranged to "set up" Ivory to be robbed. He indicated that Tony frequented the Washington Market area.

When at about 2:00 A.M. on October 15 the defendant was informed that detectives had found no one fitting Tony's description in that area, the defendant admitted that his story about Tony was a hoax. When asked to account for his conflicting stories, the defendant became very upset and expressed unwillingness to cooperate further.

Thereafter, Jaffer asked the defendant to take a second polygraph test and the defendant agreed because "he wanted to get the matter straightened out." Because the polygraph exam could not be given until later in the morning and the defendant lived in Newark, New Jersey, the detectives asked the defendant if he would agree to "staying over" for a few hours. The defendant agreed.

On route to the 26th Precinct where the defendant was to sleep, the detectives drove the defendant by the place of the

homicide and by a section of the park frequented by homosexuals to see if he recognized anyone. Upon the officers' request the defendant pointed out two people whom he recognized. At about 3:30 A.M. the detectives took the defendant to a diner where he ate a hamburger and soda. At about 4:00 A.M. they arrived at the 26th Precinct where the defendant slept on a bench by himself in an unlocked room.

At about 6:30 A.M. Jaffer woke the defendant. They had coffee and rolls and again set out for the Polygraph Unit. The defendant asked if he could get out of the police car to buy a soda and cigarettes. Moments after the defendant entered a store across the street, the detectives entered the store and made purchases.

The detectives arrived at the Polygraph Unit at about 9:30 A.M. but waited until about noon for the test to begin. When the polygraph examiner advised the defendant that he had failed the test again and began to administer yet a third examination, the defendant began to cry and asked for Detective Jaffer. Still crying, the defendant stated, "I got to tell you what really happened" and indicated that he had had a "fight" with Ivory.

Detective Jaffer instructed the defendant to stop speaking and moved him to another room where *Miranda* rights were read to him for the first time. The defendant signed a waiver form and confessed to the homicide.

After the oral confession the defendant was told that he was under arrest. The oral statement was reduced to writing and signed by the defendant.

At about 4:00 P.M. the defendant was returned in handcuffs to the Central Park South Precinct. He was fed a sandwich, soda and cookies, allowed to use the bathroom and watched a baseball game on television. At about 7:30 P.M. the defendant was again given *Miranda* warnings and made videotaped statements to an Assistant District Attorney at the 20th Precinct.

On these facts the conviction should be reversed for failure to timely give *Miranda* warnings. The case cogently brings to mind the discussion of psychological coercion in *Miranda* (384 US, at 448-458) where the Supreme Court discussed the effect of a police-dominated atmosphere in obtaining confessions.

In *People v Anderson* (42 NY2d 35 [1977]) the Court of Appeals affirmed the reversal of a 21-year-old defendant's murder conviction where the defendant's confession was obtained 19 hours after he was taken into custody for question-

ing, subjected to prolonged interrogation, deprived of sleep, food and drink, confined to one room, and isolated from his family and friends. The defendant was taken into custody at 1:00 A.M. but it was not until 13 hours later that the defendant was given *Miranda* warnings.

The defendant in *People v Balint* (92 AD2d 348 [1st Dept 1983]) was convicted in the shooting death of her fiancé. After voluntarily appearing at the police station at about 7:15 P.M., she was intermittently interrogated for 3½ hours. While she became a suspect in the homicide at about 10:00 P.M. when police discovered a bullet in her handbag, the defendant was not advised of her constitutional rights until she confessed to the murder, sometime after 11:00 P.M. This court reversed the defendant's conviction, and suppressed the confession as well as a gun, the location of which was indicated in the confession.

Here, a new trial should be ordered from which the confessions are excluded.