■ The People of the State of New York, Respondent, v Anthony Casellas, Appellant. [643 NYS2d 76] —Judgment, Supreme Court, Bronx County (Steven Lloyd Barrett, J., at hearing and trial), rendered July 7, 1994, convicting defendant, after a jury trial, of twelve counts of murder in the second degree (six counts of intentional murder [Penal Law § 125.25 (1)] and six counts of felony murder [Penal Law § 125.25 (3)]), and conspiracy in the second degree, and sentencing him, as a second felony offender, to indeterminate terms of 25 years to life imprisonment for each count of intentional and felony murder, to run concurrently as to each victim, but consecutively with respect to the convictions pertaining to each of the other five victims, and all to run consecutively to an indeterminate term of 12 1/2 to 25 years for the conspiracy conviction, affirmed.

On the morning of February 14, 1993, the police discovered the bodies of six individuals who had been shot to death. Subsequent investigation revealed that four victims, Miguel Rivera, 22, Christopher Hernandez, 15, Edwin Santiago, 17, and Annette Medina, 17, had been shot in the back of the head. Julia Santana, 40, was shot in the eye. Maria Santana, 26, was shot twice in the head, while wearing a coat and holding her keys to the apartment. It was later learned that she had been forced to open up the apartment for the perpetrators of these multiple homicides.

Although some initial leads pointed to defendant as the mastermind behind the Valentine's Day execution-style murders, it was not until some ten days later, after defendant's wife was killed and his friend shot and wounded in the Bronx County Courthouse, that the police interviewed defendant. However, as the hearing court found, and the record amply supports, because shootings inside courthouses are, thankfully, rare, the courthouse incident "was being handled with enormous interest and immediacy" and "the numerous interviews that the defendant underwent at the 44[th] precinct

were all related to his status as [a] victim." Indeed, because a court officer had discharged his weapon during this incident, the authorities treated this investigation as they would treat a shooting in which a police officer had used his or her weapon. Consequently, at the police precinct there were numerous senior level police officials and representatives of the District Attorney's office. Defendant, along with every other witness to the shooting incident was carefully interviewed, and none were first given *Miranda* warnings.

Defendant was later brought to the 40th precinct, and the police continued to interview him about the courthouse shooting. While being interviewed about the courthouse shooting, defendant was informed that his wife had died. After some further discussion with the detective, including a religious appeal that the hearing court found to be the functional equivalent of interrogation, defendant surprised the detective by making a brief one sentence oral admission regarding the killing of Edwin Santiago. The detective interrupted the interview, took a break, and administered the *Miranda* warnings to defendant. Defendant then acknowledged in writing, *inter alia*, that he understood and was waiving his constitutional rights against self-incrimination and to counsel, and proceeded to give a two page detailed written confession that minimized his role in the Valentine's Day murders.

Several hours later, an Assistant District Attorney again administered the *Miranda* warnings, and conducted a brief interview of defendant on videotape. At this point, defendant declined to answer further questions, but reaffirmed the veracity of the contents of his written statement. Based on defendant's statements, the police recovered certain physical evidence linking him to the six Valentine's Day murders, including a silencer and ammunition, found hidden in a television set in a room where defendant had been staying. The hearing court denied defendant's motion to suppress all three statements and the physical evidence as the tainted fruits of unwarned custodial interrogation.

On this appeal the principal question presented for review is whether the hearing court erred in finding that defendant was not in custody for *Miranda* purposes when he made the first brief oral admission about the murder of Edwin Santiago to the detective who was interviewing him about the courthouse shooting. The hearing court, which had an opportunity to hear, see and otherwise evaluate the witnesses and their credibility, found that a reasonable person in defendant's position would have felt free to leave before making his oral admission, and

that therefore defendant was not in custody. In its decision, the hearing court found that this was particularly true given that within the realm of homicide and shooting investigations, a courthouse shootout was unusual, and thus the sheer length and frequency of the interviews of defendant was not indicative of custody. The hearing court also noted that the change in venue from one precinct stationhouse to another as the site of the interview would not in and of itself have necessarily signaled to a reasonable innocent person in defendant's situation that the police no longer wished to inquire of him about the murder of his wife and the shooting of his companion. The new locale did not, in other words, transform what was otherwise permissible non-custodial interrogation into custodial interrogation requiring the administration of *Miranda* warnings. The hearing court also noted that defendant was never handcuffed or physically restrained, and was left unattended in an unlocked interview room while the detectives conferred. At no point was defendant ever told that he could not leave the precinct at the conclusion of the interview about his wife's murder. In short, after reviewing a totality of several factors, and without placing undue emphasis on any one single factor, the court found that while there had been interrogation within the Fifth Amendment meaning of the term, the defendant had not been in custody and *Miranda* warnings need not have been read to defendant before he made the single sentence admission inculpating himself in the murder of Edwin Santiago.

In reviewing the record, it is clear that the hearing court articulated the proper legal standard for determining whether defendant was in custody for Fifth Amendment purposes and properly considered the full panoply of factors which must be examined when applying this standard to the particular circumstances of this case (*People v Yukl*, 25 NY2d 585, *cert denied* 400 US 851). The hearing court resolved what really is, at its core, a factual question (*see, People v Centano*, 76 NY2d 837, *affg* 153 AD2d 494) and found that defendant was not in custody. Such an inherently factually driven decision is entitled to considerable deference on appeal when, as here, it has a foundation rooted in the record (*see, People v Wright*, 71 AD2d 585).

While not directly relevant to consideration of the propriety of the suppression ruling, we note in passing that the issue of the voluntariness of defendant's statements, including whether defendant was in custody at the time he made his initial admission, was also submitted to the jury. The court's instructions on this issue, spread on sixteen pages in the record, are not

challenged on this appeal. The jury's verdict implies that the jurors, as did the suppression court, found the defendant's statements to have been voluntarily made.

In short, examination of the record reveals that the factual findings on the issue of custody reached by both the hearing court at the conclusion of the suppression hearing and again by the jury, after trial, each with its unique capacities to evaluate the credibility of witnesses, were proper and should not be disturbed on appeal.

Even if it could be said that the court below erred as a matter of law on the issue of custody as pertains to the first statement, the hearing court's finding that the latter two statements were attenuated and free of any taint is supported by the record. Any consideration of the prejudice caused by admission of the initial admission cannot overlook the fact that it was the defense, not the prosecution, that placed this statement before the jury, when it elicited it during cross-examination of the detective. Defendant should not be permitted to be the knowing architect of reversible error (*People v Rosario*, 214 AD2d 345, 346, *lv denied* 86 NY2d 801). In any event, given the overwhelming evidence of defendant's guilt, the admission of the first statement was harmless error, if error at all. Concur—Milonas, J. P., Wallach and Mazzarelli, JJ.

Ross, J., concurs in the result only.