■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM H. HOFMANN, JR., Appellant. [656 NYS2d 481] —Carpinello, J. Appeal from a judgment of the County Court of Montgomery County (Aison, J.), rendered June 29, 1993, upon a verdict convicting defendant of the crime of criminally negligent homicide.

On April 16, 1991, defendant was at home alone caring for his three young children, two-year-old Brittany and $6^1/_2$-month-old twins, Amanda and Ryan, his wife having just left him the

previous day. He was having trouble with Ryan, who had been crying and colicky, when he grabbed the baby from his shoulder where he had been attempting to burp him and forced the child face down on a pillow. He left the children alone to assemble his wife's things and upon returning a while later, discovered that Ryan was pale and not breathing. Neither defendant nor responding paramedics were able to revive the child, who was declared dead at the hospital. The pathologist who performed an autopsy on Ryan immediately following his death observed that Ryan appeared to be well fed and found no external evidence of abuse or trauma and no evidence of internal injury. This pathologist concluded that death occurred by suffocation or asphyxia due to aspiration of gastric content.

In September 1991, an investigation of defendant was initiated by the police regarding Ryan's death. The police were also investigating the death of defendant's first child by this marriage, Roxanne, who had died as an infant in 1988 while in his wife's care. In addition, the authorities were investigating a spiral fracture of Amanda's leg which she sustained in June 1991. Defendant gave two written statements to the police, the first on September 24, 1991 and the second on September 26, 1991, confessing that he forcibly placed Ryan's face down onto the pillow and held it there for an undetermined period of time.

Defendant was indicted for criminally negligent homicide, manslaughter in the second degree, manslaughter in the first degree, murder in the second degree, assault in the third degree and endangering the welfare of a child. Following an unsuccessful motion to suppress his statements and a jury trial, defendant was convicted of criminally negligent homicide and sentenced to a 1$^1$/$_3$ to 4-year period of incarceration which has since been completed.

Defendant's principal arguments on appeal are that his confessions were the result of an unlawful detention and involuntarily given. The essential facts as developed at the *Huntley* hearing are as follows. At 8:00 A.M. on September 24, 1991, City of Amsterdam Police Investigator Walter Boice, Deputy Chief of Police Joseph Orsini and Police Sergeant James Nicosia pulled over defendant's vehicle as he left his place of employment following a 12-hour night shift. Orsini approached defendant's vehicle and asked him to accompany them to the police station to assist in their investigations into the deaths of defendant's children. After defendant told Orsini that he could not go to the police station because of a previously scheduled appearance in Fulton County Family Court that morning, de-

fendant was told that the Family Court appearance would be adjourned. Defendant then drove his vehicle to the police station, accompanied by the two police vehicles. According to Boice, the only purpose for bringing defendant to the police station that morning was to question defendant about Ryan's death because the bodies of both Ryan and Roxanne were being exhumed and autopsied that day.

After arriving at the police station, defendant was taken to an interrogation room, read his *Miranda* rights, reminded that he was *not* under arrest and told that "he could stop [the interrogation] at any time". At no time was defendant placed in handcuffs or otherwise restrained. Except for a few brief breaks, defendant was questioned by the Amsterdam police, as well as Schenectady County Sheriff William Barnes, throughout the day. At approximately 11:00 A.M., defendant was told for the first time that his children's bodies had been exhumed pursuant to a court order and that second autopsies were being performed. It is undisputed that defendant was extremely surprised and upset by this disclosure.

As the questioning continued about the death of his son, defendant denied intentionally hurting Ryan or doing anything "other than what he would normally do". In the early afternoon, when informed that the second autopsy had revealed a bruise near Ryan's kidney, defendant was again asked if he had struck Ryan on the morning of his death. Defendant still denied hitting or striking Ryan, but admitted grabbing him in the waist before putting him down on the pillow.

Upon being informed that his statements to police thus far did not comport with the medical findings, defendant was advised by Barnes that "if he did [kill Ryan], he should get an [a]ttorney; if he didn't do it, he should take [a] polygraph exam". Around 5:00 P.M. defendant agreed to take a polygraph examination and voluntarily accompanied the police to the State Police barracks in Loudonville, Albany County, for this purpose. On the way, the police stopped briefly at a convenience store, leaving defendant alone and unattended in the vehicle. In Loudonville, defendant was again advised, this time by State Police Senior Investigator Kevin Chevrier, that the test was voluntary. At the conclusion of the test, at approximately 10:30 P.M., defendant made oral admissions to Chevrier about Ryan's death; to wit, that he had squeezed Ryan's abdomen with his thumbs in his back and had forcibly put him face-down into the pillow. Defendant also acknowledged responsibility for his son's death. At approximately 11:10 P.M., 15 hours after defendant was first asked to accompany the po-

lice, Boice typed, and defendant signed, a three-page statement in which defendant admitted that he was "angry" and had forced Ryan down onto the pillow and that he "must have hurt Ryan". Two days later defendant voluntarily returned to the Amsterdam Police Station and gave an additional three-page statement in which he stated that he "want[ed] to give the whole truth" and acknowledged that he forcibly put the child's face down in the pillow and held it there. In this second statement, he justified his conduct by stating that he was abused as a child and learned that violence was the way to deal with his anger.

It is beyond cavil that issues concerning whether a defendant is in custody are to be resolved by the application of the objective standard of whether a reasonable person in the defendant's position, innocent of any crime, would have believed that he or she was free to leave the presence of the police (see, People v Yukl, 25 NY2d 585, 589, cert denied 400 US 851; People v Bailey, 140 AD2d 356, 358). The factors to be considered in determining whether an individual is in police custody include: "the amount of time he [or she] spent with the police * * * whether his [or her] freedom of action was restricted in any significant manner by the authorities * * * the location at and the atmosphere under which he [or she] was questioned * * * the degree of cooperation which he [or she] exhibited * * * whether he [or she] was apprised of his [or her] constitutional rights * * * and whether the questioning was investigatory or accusatory in nature" (People v Bailey, supra, at 358 [citations omitted]).

While the interrogation of defendant was admittedly lengthy and undoubtedly accusatory in nature, we are not convinced that it was illegal. Unlike the defendant in People v Travis (162 AD2d 807), who was frisked before being taken into police custody, denied permission to obtain additional clothing, accompanied even to the restroom and never advised that he could terminate the "interview" and leave at any time, in this case defendant was clearly an individual who, as anticipated by the Court of Appeals, "felt obliged to co-operate with the police in order to maintain his facade of innocence" (People v Yukl, supra, at 591-592). The length of the interrogation was determined, at least in part, by defendant, who testified that he willingly agreed to participate in the polygraph test in an effort to exonerate himself. This process of traveling to Loudonville added an additional six hours to the period of interrogation.

Nor do we find that defendant's confessions were involun-

tarily given. In this regard, we find no violation of CPL 60.45 and note that defendant was given "two bites at the apple" in accordance with CPL 710.70 (3) since both the jury and County Court assessed the voluntariness of his confessions.

We also discern no error in County Court's decision to limit the examination of the expert witnesses regarding the reliability of parental confessions. The People's rebuttal witness Barbara Wolf, a forensic pathologist, acknowledged that she lacked expertise with regard to the psychological and social aspects of an infant's death. Accordingly, County Court acted within its discretion when it precluded her from testifying about parental confessions (see, People v Heidelmark, 214 AD2d 767, 770, lv denied 85 NY2d 973). The qualifications of defendant's expert witness Jack Davies, also a forensic pathologist, regarding parental confessions were somewhat stronger than Wolf's and ultimately County Court did permit defendant to elicit some testimony regarding parental confessions from this witness. County Court's determination regarding the testimony of Wolf and Davies should not be disturbed "absent a showing of serious mistake, error of law or abuse of discretion" (People v Fish, 235 AD2d 578, 580; see, Werner v Sun Oil Co., 65 NY2d 839, 840; People v Page, 225 AD2d 831, 833, lv denied 88 NY2d 883). Inasmuch as no such showing has been made in this case, we decline to disturb the court's determinations.

Defendant next argues that the jury's verdict was against the weight of the evidence and that the evidence at trial was legally insufficient to sustain his conviction of criminally negligent homicide. In reviewing legal sufficiency, this Court must review the evidence in the light most favorable to the People (see, e.g., People v Harper, 75 NY2d 313, 316-317; People v Thompson, 72 NY2d 410, 413) and "determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury * * * and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Bleakley, 69 NY2d 490, 495 [citation omitted]).

As set forth in the indictment, in order to convict defendant of criminally negligent homicide (Penal Law § 125.10) the jury was required to find that on or about April 16, 1991 defendant caused the death of Ryan by: "among other things, forcefully placing [Ryan] face down in a pillow and holding [him in the] pillow for a period of time and thereafter leaving [him] face down in the * * * pillow for approximately one hour without attending to [him] at a time when [no one else was] available to provide care and assistance to [Ryan]."

At trial, the People introduced two confessions obtained from defendant. In addition, the People introduced medical evidence that Ryan was suffocated. The People's expert Michael Baden, a pathologist who works as a medical examiner and Director of Forensic Sciences for the State Police, testified that it was "[his] opinion, to a reasonable degree of medical certainty * * * that Ryan died as the result of suffocation, at the hands of another". The jury heard and considered the testimony and credibility of the experts and the evidence during the trial and had the right to accept or reject the opinion of any witness. Because the record adequately supports defendant's conviction, it should not be disturbed by this Court as legally insufficient (see, People v Cruz, 233 AD2d 102; People v Rodriguez, 192 AD2d 465, 466, lv denied 81 NY2d 1079). Furthermore, we do not find that the verdict was against the weight of the evidence (see, People v Klein, 221 AD2d 803, 805, lv denied 87 NY2d 975), nor do we find that defendant's confessions were uncorroborated (see, CPL 60.50; see also, People v Smith, 194 AD2d 874, 875, lv denied 82 NY2d 726).

We have considered defendant's remaining contentions and find them to be without merit.

Cardona, P. J., Crew III, Peters and Spain, JJ., concur. Ordered that the judgment is affirmed.