■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WESLEY T. CRAWFORD, Also Known as TYNELL GILES, Also Known as WEST, Appellant. [682 NYS2d 253] —Mikoll, J. P. Appeal from a judgment of the Supreme Court (Lamont, J.), rendered May 2, 1997 in Albany County, upon a verdict convicting defendant of the crimes of murder in the second degree, attempted robbery in the first degree and criminal possession of a weapon in the second degree.

Shortly after 1:00 A.M. on October 23, 1995, defendant and two accomplices entered an "OK" Taxi in furtherance of their prearranged plan to rob the driver. The attempted robbery went awry and the driver was fatally shot in the head by one of the accomplices. The cab then struck a house and came to rest on Franklin Street near the intersection of Plum Street in the City of Albany.

At approximately 1:30 A.M., Albany Police Officer Joseph Pickel responded to a call of a motor vehicle accident in the vicinity of Franklin and Plum Streets. Reaching the scene in approximately 30 seconds, Pickel observed defendant lying on the ground, with his eyes open, next to the opened rear passenger door of the cab. Defendant made no response when Pickel asked if he was all right. When Pickel looked into the cab, he observed two apparently injured occupants:* the driver slumped across the front seat, clutching a roll of money, and a back-seat passenger whose upper body was also slumped across the front seat over the driver. Pickel observed a gun on the front seat, which he removed and placed in his waistband. When a second officer, Michael McCraith, arrived on the scene, Pickel apprised him that a weapon had been recovered and suggested that defendant be patted down. As defendant lay on his back, McCraith patted him down in the front and found no weapon. Defendant then sat up on his own initiative, whereupon McCraith observed a bulge underneath defendant's sweatshirt and, upon lifting it, discovered a loaded revolver. Defendant was placed under arrest for possession of the weapon and transported to the hospital for treatment.

McCraith advised defendant of his *Miranda* rights at the hospital at approximately 2:27 A.M. After acknowledging that

---

\* The third accomplice fled the scene and later surrendered.

he understood his rights, defendant made no response when asked whether he would answer questions about the incident. Shortly thereafter, defendant summoned McCraith and made certain oral statements not at issue here. At approximately 3:00 A.M., Albany Detective Kenneth Wilcox met with defendant and again advised him of his *Miranda* rights, at which point defendant stated that he wanted to relate what had occurred. Defendant made an oral statement and agreed to give a written one. Wilcox left the room to interview one of the other participants while defendant received medical treatment. Beginning at approximately 6:00 A.M. and concluding at 8:02 A.M., Wilcox and Detective Nunzio Cangemi took a written statement from defendant in which he detailed the planned robbery and events culminating in the shooting of the cab driver.

Defendant initially contends on this appeal that the police lacked legal justification for the frisk which led to discovery of the weapon because, at the time, they were simply investigating a motor vehicle accident and were unaware that any crime had been committed, and there was nothing in defendant's actions to warrant a belief that their safety was endangered. We disagree. Despite the fact that the police did not initially know that the cab driver had been shot in the course of an attempted robbery, they were justified in conducting a limited pat-down of defendant based upon the presence of a weapon on the front seat of the cab and defendant's presence on the ground outside the opened cab door.

It has long been recognized that permitting police to take reasonable precautions for their safety is an essential corollary to the exercise of their powers and responsibilities, and that under certain circumstances a limited frisk for weapons is reasonable and constitutionally permissible (*see, Terry v Ohio*, 392 US 1, 26; *People v Batista*, 88 NY2d 650, 654; *People v Rivera*, 14 NY2d 441, 446). This authority exists irrespective of whether the officer has probable cause for an arrest; it derives from the existence of the reasonable belief that a limited search for weapons is necessary for the protection of the police officer or others. The relevant inquiry is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger", and each case must be decided on its own facts (*see, Terry v Ohio, supra*, at 27; *see also, People v Carney*, 58 NY2d 51). We are satisfied that given the circumstances, the presence of a weapon on the front seat of the cab constituted a sufficient predicate for the police to conduct a limited frisk of defendant to ensure their

own safety, and that of other persons at the scene, while performing their duties in connection with the accident/crime scene.

This conclusion also disposes of defendant's challenge to the admissibility of his written statement as tainted by an unlawful search and seizure. Once the police discovered the loaded weapon in defendant's possession, he was lawfully placed under arrest. Similarly without merit is defendant's claim that his written statement was involuntary. Notably, defendant does not maintain that he did not receive *Miranda* warnings, or that he was threatened or mistreated (*see, People v Hofmann*, 238 AD2d 716, *lv denied* 90 NY2d 940; *People v Thomas*, 223 AD2d 612). Nor does he allege that he was medically unstable, incoherent or unaware when he gave the statement. In fact, he was sufficiently alert to put forth an exculpatory version of events to McCraith. Defendant in fact concedes the voluntariness of his oral statements to McCraith and Wilcox. He claims, however, that his written statement was involuntarily made because the questioning extended over a period of approximately six hours, while he was receiving medical treatment, and because his sister was not permitted to see him at the hospital. None of these circumstances render his statement involuntary.

Although the statement was not concluded until 8:02 A.M., the questioning was intermittent rather than continuous, due, in part, to interruptions for defendant's treatment and the fact that Wilcox was also interviewing one of the other participants during the same period. While defendant was receiving medical treatment at the time of his statement, there was no showing, or even claim, that his physical or mental condition precluded his understanding or waiver of his *Miranda* rights. Hospital personnel did not indicate that the questioning should end, nor did defendant request that the interview be terminated because of discomfort or pain. Finally, although defendant claims that the voluntariness of his statement was compromised because he was denied access to his sister, there is no indication that he at any time asked to see her or was deceived or misled as to her presence. "[I]t is well-settled that the police have no obligation to let family members or friends communicate with a competent adult while he or she is in custody" (*People v Sticht*, 226 AD2d 838, 840, *lv denied* 88 NY2d 995).

Defendant next contends that Supreme Court erred in denying his *Batson* objection to the People's peremptory challenge of an African American prospective juror. After 11 jurors, including one African American, were sworn, the People·

exercised a peremptory challenge to a prospective juror who was also African American. Upon defendant's objection, Supreme Court directed the People to articulate a race-neutral explanation for the challenge. The People indicated that because they had a considerable number of peremptory challenges remaining, their intention was to use these challenges to reach a prospective juror whom they particularly wished to seat. The court accepted this explanation as race-neutral and then found that defendant failed to meet his burden of establishing purposeful discrimination, noting that the original jury pool contained four African Americans, one of whom was already seated as a juror while the others had been excused for cause or by consent. We are satisfied that Supreme Court properly engaged in the three-step process required under *Batson v Kentucky* (476 US 79) and in permitting the peremptory challenge, having correctly concluded that defendant failed to prove purposeful racial discrimination.

Finally, defendant complains that his conviction of criminal possession of a weapon in the second degree is unsupported by legally sufficient evidence, specifically citing the lack of proof of his use or intent to use the weapon and insufficient evidence as to its operability. Our view of the evidence is otherwise. Defendant admitted that he and his codefendants planned to rob the cab driver and explained that he was in the front seat of the cab and the other armed participant was positioned directly behind the driver because "we were the ones with the guns". His intent to use the weapon "unlawfully against another" can be inferred from these circumstances (*People v Higdon*, 162 AD2d 957, 958, *lv denied* 76 NY2d 893). As to the weapon's operability, the People adduced testimony from Albany Detective Dean Halpin that the weapon was test-fired using the ammunition contained therein and found to be operable. Contrary to defendant's assertions in his brief, the testimony of State Police Sergeant Charles Boone does not establish otherwise.

Crew III, Yesawich Jr., Spain and Graffeo, JJ., concur. Ordered that the judgment is affirmed.

