■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRUCE W. ECKHARDT, Appellant. [761 NYS2d 338] —Cardona, P.J. Appeal from a judgment of the County Court of Otsego County (Coccoma, J.), rendered July 23, 2001, upon a verdict convicting defendant of the crime of murder in the second degree.

Defendant was charged in an eight-count indictment with murder in the first degree (three counts), murder in the second degree (three counts), kidnapping in the first degree and burglary in the second degree, arising from the disappearance and subsequent killing of his estranged girlfriend, Donna Evans, a resident of the Town of Westford, Otsego County. After an extensive search, Evans's body was discovered in Pennsylvania approximately 1½ years after she was first reported missing. From the forensic evidence, it appeared likely that Evans died from blunt force trauma. Following a jury trial, defendant was convicted of one count of murder in the second degree and sentenced to an indeterminate prison term of 25 years to life.

Defendant argues that County Court erred in suppressing only those statements made after his arrest on December 16, 1999, following his request for an attorney. He contends that his indelible right to counsel attached at an earlier time, namely, after his retained attorney, William Schebaum, advised the police in mid-July or early August 1998 that he represented defendant in connection with the disappearance of Evans.

A defendant's state constitutional right to counsel attaches indelibly in two situations. "First, it arises when formal judicial proceedings begin, whether or not the defendant has actually retained or requested a lawyer. Second, the right to counsel attaches when an uncharged individual 'has actually retained a lawyer in the matter at issue or, while in custody, has requested a lawyer in that matter'" (*People v Ramos*, 99 NY2d 27, 32-33 [2002] [citations omitted], quoting *People v West*, 81 NY2d 370, 373-374 [1993]; *see People v Johnson*, 303 AD2d 903, 904-905 [2003]). Here, defendant argues the second situation premised upon his retention of Schebaum in July 1998. At the suppression hearing, Schebaum testified that defendant retained him in July 1998 in connection with two family of-

fense petitions involving defendant and Evans. Schebaum indicated that, prior to September 1998, he contacted the State Police, Troop C, to speak to members of the State Police who had informed defendant that they wanted to talk to him about Evans. Schebaum also wanted to make arrangements for defendant to remove his belongings from the residence that he had occupied with Evans. He first called Troop C in the City of Oneonta, Otsego County, however, he was referred to a different troop upstate because defendant was residing in that region. Schebaum had no recollection of what troop he called, or when or to whom he spoke, except that it did not involve Troop C. He testified that he had no recollection of saying anything to the State Police relating to Evans's disappearance, or his representation of defendant in that regard. He did remember indicating that if they wanted to speak to him, such could be arranged.

Defendant also argues that the State Police manipulated him into speaking in the absence of Schebaum on August 5, 1998. On that date, State Police Senior Investigator Gary Gelinger testified that he and another investigator met with defendant in the Village of Keeseville, Clinton County. They informed him that they were investigating Evans's disappearance and asked defendant, among other things, if he would accompany them to the Keeseville station. Defendant stated that he was not going to be taken into custody and *"maybe* he should call an attorney." When Gelinger told defendant that he was not being accused of anything and showed him a missing person teletype, he answered their questions. Gelinger testified that defendant never expressed a desire to stop speaking with them or to consult an attorney. The interview ended and the police left.

Based upon the foregoing evidence, we cannot say that County Court erred by refusing to suppress defendant's oral statements made prior to December 16, 1999. The evidence does not demonstrate that the police knew that defendant had requested or retained an attorney to represent him in connection with the disappearance of Evans. Accordingly, we find that defendant's state constitutional right to counsel was not violated (*see People v Ramos*, 99 NY2d 27, 32-33 [2002], *supra*; *People v West*, 81 NY2d 370, 373-374 [1993], *supra*; *People v Johnson, supra* at 905).

Next, we address defendant's contention that the physical evidence retrieved during warrantless searches of the residence he shared with Evans conducted on July 31, 1998 and August 2 and 3, 1998, should have been suppressed. Evans

was first reported missing on July 31, 1998 by a realtor and friend, Pat Ryan. At the suppression hearing, State Trooper Paul Bowers testified that he met Ryan at Evans's residence in the Town of Westford, Otsego County on the afternoon of July 31, 1998. He ascertained that Evans and defendant had resided at that location. Ryan stated that she represented the owner of the house, had keys, and checked it on occasion. She indicated that she had not talked to Evans since July 14, 1998 and, at that time, she sounded upset. Ryan reported that she entered the house earlier that week looking for Evans. At that time, she tried to use the phone but heard no dial tone. She also observed Evans's locked car in a basement garage packed with various boxes, suggesting that Evans was moving. Ryan was concerned about Evans's welfare because Evans was depressed and had problems with her boyfriend (defendant) against whom she had an order of protection. Of additional concern was the unusual fact that Evans's cat, of which she was very protective, had been left outdoors unattended.

After this conversation, Ryan admitted Bowers into the house. Bowers stated that he confirmed there was no dial tone on the phone and observed that the garbage in the trash receptacle had mold growing on it. He also noticed that Evans's car had been packed. After updating his supervisor, Bowers reentered the house and went upstairs with Ryan. He noticed a newspaper which appeared unread. He removed medications from Evans's bedroom. Bowers testified that he entered the house to obtain information on Evans's whereabouts. In the den, he looked through various papers seeking information that would assist in locating Evans. In doing so, Bowers indicated that he found, among other things, papers from a car rental company.[1] He did not find any signs of forced entry, struggle or abduction.

The State Police, who had now been advised that Evans had made two suicide attempts, returned to her house on August 2, 1998 and again searched for her. They took photographs to document the condition of the house, however, removed nothing. They searched the area outside with canine units. On August 3, 1998, the ground search continued and an air search commenced. The State Police returned to the residence accompanied by Evans's daughter, Penny Briggs. Briggs signed a consent permitting the officers to search the residence and accompanied them in the hope that she might see something to help locate her mother. She pointed out her mother's eyeglasses

---

1. It was ultimately revealed at trial that the rental car had been leased by defendant.

on the living room coffee table. The officers photographed the residence again and, as on August 2, 1998, removed nothing. State Police Investigator Steven Anderson from the forensic investigation unit noticed a newspaper on the kitchen table dated July 16, 1998. Upon examination of the two doors which provided entry into the house through the basement, he discovered fresh pry marks. He noticed that Evans's bed was unmade and there were unknown stains on the linens and mattress. Outside the house he observed that the cover of a telephone pedestal box was ajar and, upon inspection, determined that a wire had been disconnected. He also discovered that unlike the other utility poles along the road, the lightbulb was missing from the utility pole in front of the house. In Evans's upstairs bedroom, Anderson noted that the mattress pad had been pulled away from the head of the bed, the fitted sheet was missing and there were no bed pillows. Briggs indicated that her mother would never leave the bedroom in that condition. Thereafter, having decided that there was evidence indicating foul play, the State Police obtained a search warrant and executed it on August 5, 1998.

Contrary to defendant's argument, we find that the warrantless entries into the residence on July 31, 1998 and August 2 and 3, 1998, were lawful under the emergency exception to the 4th Amendment's warrant requirement. The emergency exception applies when the three-prong test established in *People v Mitchell* (39 NY2d 173 [1976], *cert denied* 426 US 953 [1976]) is satisfied. Under that test, the police must first "have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property" (*id.* at 177). Second, "[t]he search must not be primarily motivated by intent to arrest and seize evidence" (*id.*). Third, "[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched" (*id.* at 177-178; *see People v Molnar*, 98 NY2d 328, 332 n 2 [2002]; *People v Greenleaf*, 222 AD2d 838, 839 [1995], *lv denied* 87 NY2d 973 [1996]). Confronted with the facts as set forth above, the officers' entries into and searches of the residence were justified as a response to an emergency situation, namely, to locate Evans and possibly render aid to her. Up to this point, their actions were not motivated by an intent to arrest and seize evidence, but out of concern for the health and safety of Evans. Notably, before the search of August 3, 1998, the police had no reasonable basis to believe that a crime had occurred and, therefore, no basis upon which to apply for a search warrant. In our view, the police satisfied the three prerequisites necessary for the invocation of the

emergency exception to the warrant requirement.[2] That said, we find no merit in defendant's arguments that the evidence seized pursuant to the search warrant and the search of the car rented by defendant must be suppressed as "fruit of the poisonous tree" (*Wong Sun v United States*, 371 US 471, 488 [1963]). Accordingly, we find that defendant's 4th Amendment rights were not violated.

Next, we find unpersuasive defendant's argument that County Court erred by permitting the People's expert witness, Henry Lee, to view the blood stains depicted in various photographs of Evans's bedroom and to opine, in essence, that it was possible for someone to be struck by a blunt object with sufficient force to cause medium velocity blood spatter and not sustain a fracture of any underlying bones. "It is well established that the admissibility and scope of expert testimony is committed to the sound discretion of the trial court" (*People v Fish*, 235 AD2d 578, 579 [1997], *lv denied* 89 NY2d 1092 [1997] [citations omitted]; *see People v Cronin*, 60 NY2d 430, 433 [1983]). At trial, it was stipulated that Lee was an expert in the fields of crime scene reconstruction and blood stain pattern analysis. He testified in depth regarding his education, training and experience, which included rendering assistance in the investigation of 6,000 cases. Consequently, we conclude that County Court had sufficient grounds for finding that Lee had the "requisite skill, training, education, knowledge or experience" to provide a reliable opinion (*Matott v Ward*, 48 NY2d 455, 459 [1979]; *see People v Geraci*, 254 AD2d 522, 524 [1998]). In the absence of "serious mistake, error of law or abuse of discretion" (*People v Hofmann*, 238 AD2d 716, 720 [1997], *lv denied* 90 NY2d 940 [1997], quoting *People v Fish, supra* at 580), we find no basis to disturb County Court's determination.

Defendant next argues that it was error for County Court to admit testimony regarding battered woman syndrome. He contends, among other things, that the testimony was irrelevant and subjected him to the risk of undue prejudice. Even assuming the admission was error, given the overwhelming circumstantial evidence of defendant's guilt, we find no significant probability that, but for this error, defendant would have been found not guilty. Therefore, any alleged error was harmless (*see People v Crimmins*, 36 NY2d 230 [1975]).

Next, contrary to defendant's argument, we find that the evidence was legally sufficient to sustain his conviction for murder in the second degree. A person is guilty of murder in the

---

**2.** Although the police also sought to support their entries and searches upon third-party consent, we need not determine that issue.

second degree when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person" (Penal Law § 125.25 [1]). The trial evidence included the testimony given during the suppression hearing. In addition, the evidence revealed no dispute that the skeletal remains found in December 1999 were those of Evans. Her remains were discovered off a dirt road in a remote wooded area in Pennsylvania, less than 10 miles from the home of defendant's parents and less than three miles from the former home of defendant's brother. Evans was apparently clad only in underwear and a nightgown. She had no family and no friends there and had never been in that area.

The evidence further indicated that Evans was last known to be alive on July 16, 1998. Blood stains found on the bed sheet, telephone and lamp in her bedroom, as well as the cargo net of defendant's rental car, contained her DNA. Defendant's DNA was found in another blood stain on the same bed sheet. Furthermore, forensic analysis of blood splatter indicated that she likely died from blunt force trauma, a possible cause of death corroborated by the People's pathologist. A tape recording of defendant's conversation with New Jersey police officers indicated that Evans was never in or near the rental vehicle. Although defendant indicated that he drove his rental car to Pennsylvania, leaving at 2:00 A.M. or 2:30 A.M on July 17, 1998, to borrow $2,500 from his father, the proof indicated that he only obtained $100 from his mother. A few days before leaving, there was testimony that he was angry about being forced out of Evans's residence and that if he "could get away with murder he would." The testimony also indicated that defendant stated that Evans had taken his keys to the residence, however, he could enter with a screwdriver. During the summer of 1998, he told his employer that his relationship with Evans had deteriorated and that he just wanted her out of his life. Additionally, there was proof that defendant had knowledge of phones and phone wiring. His thumb print was found on the telephone pedestal box near the house but, in statements to the police, he denied ever working inside that pedestal. A telephone company employee testified that he tested the wiring at the pedestal box and determined that while there was a dial tone at it, there was none at the house due to tampering with a wire inside the box.

Viewing the trial evidence in a light most favorable to the prosecution (*see People v Taylor*, 94 NY2d 910, 911 [2000]; *People v Contes*, 60 NY2d 620, 621 [1983]), we find a valid line of reasoning and permissible inferences from which a rational

juror could conclude beyond a reasonable doubt that defendant intended to and did cause the death of Evans.

Defendant's remaining contentions, including his claims that a DNA analysis report was improperly admitted and that he received ineffective assistance of counsel, lack merit.

Mercure, Peters, Carpinello and Rose, JJ., concur. Ordered that the judgment is affirmed.