THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v DION BAILEY, Respondent.

The credible evidence adduced at the defendant's pretrial suppression hearing reveals that on September 24, 1986, New York City Police Detective Bernard Judge was assigned to investigate the shooting homicide of one Jeffrey Shaw in Queens County. Detective Judge's preliminary investigation established that the defendant had known the victim; hence, on the following day, the detective and his partner arrived at the defendant's residence between 3:15 P.M. and 3:50 P.M. and

asked him to accompany them to the 105th Precinct for an interview. The defendant agreed to do so, and rode alone and unrestrained in the rear seat of the detectives' unmarked police vehicle to the station house. Upon their arrival, the defendant was interviewed by Detective Judge concerning any knowledge which he might have regarding the killing, but he provided no helpful information. Due to the fact that the defendant appeared to be withholding something which might further the investigation, Detective Judge asked him if he would be willing to submit to a polygraph examination and apprised him that such testing was strictly voluntary. The defendant again agreed and accompanied the detectives to the police academy in Manhattan, where he was placed in a waiting area near a public elevator system. Detective Barry Goldblatt subsequently introduced himself to the defendant and informed him of the testing procedure. After ascertaining from the defendant that he had no physical or mental problems and no involvement with drugs or alcohol which would prevent him from being examined, Detective Goldblatt presented him with a written waiver form which the defendant read and signed. The form indicated, *inter alia,* that the defendant was submitting to the testing voluntarily and not as the result of any form of coercion or duress. He was then asked a series of questions regarding any information which he might have as to the killing of the victim, but he denied knowing anything about the crime. Upon completion of the examination, Detective Goldblatt privately informed Detective Judge that the results indicated that the defendant had been deceptive with regard to his knowledge of the crime, and Judge requested a second test wherein the defendant would be questioned concerning his possible participation in the offense. Upon consenting to undergo a second test, the defendant again denied any knowledge of or participation in the shooting. At the conclusion of the examination, he signed a second waiver form indicating that he had submitted to the testing voluntarily "and remained of my own free will, knowing that I could leave at any time". Detective Goldblatt informed Detective Judge that he again thought the defendant had been deceptive during the second test.

At approximately 11:00 P.M., Detective Judge and his partner left the police academy with the defendant in order to return him to the precinct for a further interview. The defendant again rode alone and unrestrained in the rear seat of the vehicle. Upon their return, Detective Judge apprised the defendant of his constitutional rights by reading them from a

preprinted form. He further told the defendant that he did not believe his claim of ignorance with regard to the killing and wished to question him further. The defendant received, acknowledged and expressly waived his rights, whereupon he signed the form. Detective Judge asked him to tell the truth, and the defendant agreed to do so, giving a statement which was written down by the detective and which indicated that the victim had been shot twice with his own gun during a struggle with the defendant which the victim himself had initiated. The defendant then read the written statement over and signed each page. Thereupon, at 12:15 A.M. on September 26, 1986, he was placed under arrest. Detective Judge maintained that the defendant was free to leave throughout these events and was not placed in custody until he made the aforementioned incriminating statement.

The hearing court, while making no findings contrary to the above-recited facts, nevertheless concluded that a reasonable person in the defendant's position would have believed that he was in custody and was not free to leave prior to making the inculpatory statement because of the length of time the defendant spent with the police and the fact that he had "failed" two polygraph examinations. Because probable cause did not exist prior to the making of the statement, the court reasoned that the detention of the defendant was illegal and that the suppression of his statement was therefore necessary. We now reverse.

It is well settled that issues concerning custody are to be resolved by the application of the objective standard of whether a reasonable person in the defendant's position, innocent of any crime, would have believed he was free to leave the presence of the police (see, *People v Yukl,* 25 NY2d 585, *cert denied* 400 US 851; *People v Ross,* 134 AD2d 298, *lv denied* 70 NY2d 937). The factors to be weighed in determining whether a given individual was in police custody include the amount of time he spent with the police (see, e.g., *People v Anderson,* 42 NY2d 35), whether his freedom of action was restricted in any significant manner by the authorities (see, *People v Rodney P.,* 21 NY2d 1), the location at and the atmosphere under which he was questioned (see, *People v Yukl, supra),* the degree of cooperation which he exhibited (see, e.g., *People v Torres,* 97 AD2d 802), whether he was apprised of his constitutional rights (see, *People v Oates,* 104 AD2d 907), and whether the questioning was investigatory or accusatory in nature (see, e.g., *People v Johnson,* 91 AD2d 327, *affd* 61 NY2d 932).

In our view, a consideration of these factors and of the credible hearing evidence compels the conclusion that the defendant was not in a custodial setting until he made the incriminating statement to Detective Judge. The proof overwhelmingly demonstrates that the defendant at all times appeared to be willing to aid in the investigation in any way possible. Indeed, he conceded at the hearing that he had voluntarily accompanied the detectives to the 105th Precinct for questioning and that he subsequently agreed to submit to the polygraph testing because he had "nothing to hide". He further acknowledged the fact that he was free to leave at any time during the examinations by signing a waiver form to that effect at their conclusion. In this regard, we decline to credit the defendant's assertions that he informed the detective of a pending unrelated charge upon which he was represented by counsel, that he was told he had performed poorly after each polygraph test and that he would be returned to the precinct and arrested, and that he was guarded by a detective during the return trip from the police academy to the station house. The various oral and printed waivers executed by the defendant, when coupled with the consistent and credible testimony of Detectives Judge and Goldblatt regarding the events, belie these claims by the defendant. Moreover, we note that the hearing court did not incorporate any of these assertions into its findings of fact.

While extended police interrogation may give rise to a custodial setting under certain circumstances *(see, e.g., People v Anderson, supra)*, it is clear that "[e]ven an interview of extended duration may be noncustodial" *(People v Johnson, supra,* at 330; *see, e.g., People v Yukl, supra)*. Although the defendant was in the company of police for a period of approximately 8 or 9 hours before he inculpated himself, the evidence establishes that his presence was entirely voluntary and that he was interviewed in an investigatory fashion by Detectives Judge and Goldblatt individually, with numerous and lengthy breaks between periods of questioning. In view of the facts that the defendant repeatedly manifested a willingness to aid the police in their investigation, that he was not restrained in any manner, and that the nature of the questioning itself was neither confrontational nor coercive *(see, Matter of Kwok T., 43 NY2d 213)*, we conclude that the length of time which he spent with the detectives and the police settings in which he was questioned fail to support a determination that he was in custody *(see, People v Yukl, supra;*

*People v Ross, supra; People v Scott,* 116 AD2d 755, *lv denied* 67 NY2d 889).

Similarly, the hearing court's reliance upon the fact that the defendant "failed" two polygraph examinations is misplaced, for the evidence demonstrated that he was not informed of the test results at any time and therefore was unaware of the fact that they indicated he had been deceptive in responding to police questioning. Likewise, the mere administration of the *Miranda* warnings to the defendant did not automatically place him within a custodial setting, as the receipt of such constitutional rights does not preclude a finding that a reasonable, guiltless person would believe he was free to leave *(see, People v Ross, supra; People v Eke-Spiff,* 128 AD2d 889; *People v Oates, supra).* Indeed, in view of the defendant's highly cooperative attitude in this case, the administration of *Miranda* warnings appears to have been prompted by an excess of caution on the part of the police and served to insure that his subsequent statement was freely and knowingly made *(see, e.g., People v Ross, supra).*

Hence, applying the foregoing legal principles to the credible evidence presented at the hearing, we conclude that a reasonable person in the defendant's position, innocent of any crime, would have believed that he was free to leave. Consequently, a custodial setting did not arise until the defendant inculpated himself, at which time his arrest was supported by ample probable cause. Accordingly, the statement was erroneously suppressed. Kunzeman, J. P., Rubin, Eiber and Sullivan, JJ., concur.