THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RANDOLPH PARSAD, Appellant. [662 NYS2d 835] —Appeal by the defendant from a judgment of the Supreme Court, Kings County (Egitto, J.), rendered March 21, 1995, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Harkavy, J.), of that branch of the defendant's omnibus motion which was to suppress statements made by him to law enforcement officials.

Ordered that the judgment is affirmed.

The defendant argues that incriminating statements he made to police detectives must be suppressed on the ground that he was questioned while he was in police custody but before he was advised of his *Miranda* rights (*see, Miranda v Arizona*, 384 US 436). The well-established standard for determining whether an individual is in custody is whether "a reasonable person, innocent of any crime would not have believed he was in custody under the circumstances" (*People v Centano*, 76 NY2d 837, 838; *People v Yukl*, 25 NY2d 585, 589, *cert denied* 400 US 851). The factors to be considered in making such a determination include "(1) the amount of time spent with the police, (2) whether the person's freedom of action was restricted, (3) the location and atmosphere under which the questioning took place, (4) the degree of cooperation exhibited, (5) whether constitutional rights were administered, and (6) whether the questioning was investigatory or accusatory in nature" (*People v Mosley*, 196 AD2d 893).

The evidence before the hearing court was that Detectives Jerome Geiger and Douglas Hopkins investigated the murder of Krzystof Minicz, a homeless man, which occurred early in the morning on June 5, 1994. After interviewing neighbors from the area in which Minicz's body was found, the detectives learned that the defendant and another individual, also homeless men, were the constant companions of Minicz. Later that day, one of the neighbors telephoned Detective Geiger to inform him that the two individuals were sitting at the corner of Nostrand Avenue and Kings Highway. Detective Geiger went to that location, where he found the defendant and Robert James.

Detective Geiger and the officers with him displayed their shields, and asked the defendant his name. Detective Geiger told the defendant that he wanted to talk to him about Minicz, and asked the defendant if he would go to the precinct. Neither Detective Geiger nor any of the officers with him displayed their weapons or threatened the defendant to go with them, and the defendant never indicated that he did not want to go. To the contrary, without responding verbally, the defendant voluntarily went into Detective Geiger's vehicle. James went into another police vehicle. The detective drove the defendant, who was not handcuffed, to the precinct.

At this point, Detective Geiger had no information that the defendant was involved in the homicide. The defendant was not a suspect, and the detective was only "investigating" the matter. At the precinct, the defendant, still unhandcuffed, was placed in an unlocked interview room (which contained a chair, desk, table, and television). The defendant never expressed a desire to leave. Although the defendant initially stated that he did not want to say anything, the detective, who at that point still did not consider the defendant a suspect, asked him whether he had placed a call to 911. The investigation was, apparently, precipitated by a 911 call in which the caller stated that there was a body in the basement of a building under construction, and that an ambulance was needed. The defendant denied making the call, and the detective left the room for approximately 45 minutes, leaving the defendant alone in the unlocked room. Detective Geiger later returned to the room and gave the defendant coffee and food. The detective gave the defendant an opportunity to make a call. After the defendant ate, the detective again asked about the 911 call. When the defendant denied calling, the detective called 911 and they listened to the tape, in which they heard the caller identify himself to 911 as Randolph Parsad.

Detective Geiger then questioned the defendant about his activities the previous day, and the defendant stated that he went to his sister's house to shower and change his clothes. Detective Hopkins asked the defendant for permission to retrieve the clothing that the defendant had been wearing the prior night, and the defendant signed a written statement agreeing to the request. Detective Hopkins went to the defendant's sister's house to pick up the clothes the defendant had changed out of. He brought a bloodstained shirt back to the precinct, which he showed to the defendant, asking him if it was his. When the defendant responded affirmatively, Detective Hopkins read the defendant his *Miranda* rights, after

which the defendant gave a written statement, in which he admitted beating the decedent. This occurred approximately three hours after the defendant had been brought to the precinct. During the entire interview, the defendant never expressed a desire to leave. Furthermore, he was never threatened or subjected to any force.

The court gave "full credence to the testimony of Detectives Geiger and Hopkins", and found that the statements made by the defendant before he was given the *Miranda* warnings were made as part of the investigation and were not made in violation of the defendant's constitutional rights. We agree.

Our dissenting colleague has characterized the events based on emphases and factual interpretations that do not comport with the express factual findings of the hearing court. The determination of the hearing court, which had the advantage of seeing and hearing the witnesses, should not be set aside unless clearly unsupported by the record (*see, People v Prochilo*, 41 NY2d 759, 761). Here it was not.

Although the defendant had been drinking alcohol when the officers initially approached him, the evidence establishes that the defendant clearly understood the reason for and purpose behind the police investigation and was able to walk and articulate appropriate responses to the detectives' questions. He voluntarily accompanied the officers to the police station. At no point during the questioning did the defendant request to leave the police station, and the evidence reveals that the atmosphere at the precinct was not coercive. The questioning took place over a three-hour period (including a 45 minute break), during which the defendant was given coffee and food and left unattended in an unlocked room. Under these circumstances, we conclude that the pre-*Miranda* questioning of the defendant was not illegal (*see, People v Yukl, supra; see also, People v Hofmann*, 238 AD2d 716).

The defendant's remaining contentions are without merit. Rosenblatt, J. P., Thompson and Pizzuto, JJ., concur.

Friedmann, J., dissents and votes to reverse the judgment, grant that branch of the defendant's omnibus motion which was to suppress the statements made by the defendant to law enforcement officials, and order a new trial, with the following memorandum. Because the record of the suppression hearing reveals that the defendant was in custody and was not informed of his constitutional rights while being questioned for several hours by the police, I would reverse the judgment of conviction, grant that branch of the defendant's omnibus motion which was to suppress his statements, and order a new trial.

At approximately 5:45 P.M. on June 5, 1994, the defendant, who was intoxicated and was drinking beer and rum on a street corner in Brooklyn, was surrounded by four police officers, who displayed their shields. Detective Geiger told the defendant that he was "going to take him to the precinct" "regarding" the bludgeoning death of Krzystof Minicz. The officers "put" the defendant, who remained mute, into the patrol car and drove him to the station house. No one advised the defendant that he did not have to accompany the officers.

Without giving the defendant his *Miranda* warnings, Detective Geiger began to question him in an accusatory manner about the murder of Minicz, who, like the defendant, had been a homeless alcoholic. Although the defendant repeatedly protested that he "didn't want to talk about it" and "didn't want to say anything", the questioning continued for several hours.

Among other things, the defendant denied having telephoned 911 to report the presence of Minicz's body at the bottom of a 20-to-25-foot-deep pit at a construction site, approximately 30 feet from a primitive "bedroom" where the defendant, Minicz, and another homeless man sometimes sought shelter. Geiger, who believed that the defendant was lying, persisted in asking him whether he had made the 911 call.

In addition, having learned from various witnesses that the defendant had spent the day before the murder quarreling with the victim, Geiger asked him repeatedly what he had done on June 4th and 5th. At one point, Geiger testified that the third homeless man had reported seeing the defendant strike Minicz with a two-by-four on the night of the killing. Coincidentally, police officers had discovered a bloodstained two-by-four in a corner of the homeless men's "bedroom" at the construction site; and they had also noted bloody "drag marks * * * leading out from the bedroom over into the pit" where the body was found.

At some point during the questioning, Geiger removed the defendant's blue pants because they had a dark, unexplained stain on them. Geiger and another officer then grilled the defendant about what he had done after fighting with Minicz, and what he had been wearing on the night of the crime. The defendant related, *inter alia*, that he had been wearing a blue shirt, and that he had gone to his sister's house to shower and change his clothes. The police paid a visit to the sister, who gave them a flowered print shirt stained with blood, which she said her brother had been wearing the night before. Officer Hopkins confronted the defendant with this shirt, saying:

"Listen, you lied to me about the shirt you had on * * * I found this shirt here * * * Isn't this in fact the shirt that you had on * * * that evening?" Only after the defendant responded, "Yeah, that's the one", did the officers read him his *Miranda* warnings for the first time. Immediately thereafter, at 9:15 P.M., the defendant gave a written statement, followed by a videotaped confession, both of which were used against him at trial.

It does not appear to me that a reasonable person in the defendant's position, innocent of any crime, would have believed he was free to leave the presence of the police before he was read his *Miranda* warnings (*see, People v Centano*, 76 NY2d 837, 838; *People v Anderson*, 42 NY2d 35; *People v Yukl*, 25 NY2d 585, *cert denied* 400 US 851; *People v Macklin*, 202 AD2d 445; *People v Bailey*, 140 AD2d 356, 358). The defendant, who was inebriated when he was accosted by four police officers, was transported to the precinct without being told that he could decline to go, and without being given his constitutional rights. Once there, he was partially stripped, was questioned in an accusatory manner—despite his declaration that he "didn't want to talk about it", was charged with lying about the 911 call and his attire, and was confronted with his bloody shirt. Under the totality of these circumstances, the defendant's confessions were the involuntary product of a custodial interrogation conducted in the absence of constitutional safeguards (*cf., e.g., People v Coggins*, 234 AD2d 469; *People v Sohn*, 148 AD2d 553; *People v Bailey, supra*). In addition, it is clear from the hearing record that the police had probable cause to arrest the defendant long before they apprised him of his constitutional rights (*see, People v Macklin, supra*).

Accordingly, I would reverse the judgment of conviction, suppress the defendant's statements, and order a new trial.