Randolph PARSAD, Petitioner–
Appellant,

v.

Charles GREINER, Superintendent,
Sing Sing Correctional Facility, Eliot
Spitzer, Attorney General of New
York, Respondents–Appellees.

Docket No. 02–2275.

United States Court of Appeals,
Second Circuit.

Argued: March 4, 2003.

Decided: July 21, 2003.

Lawrence T. Hausman, The Legal Aid Society, New York, N.Y. for Petitioner–Appellant Randolph Parsad.

Anne C. Feigus, Assistant District Attorney, Kings County District Attorney's Office (Charles J. Hynes, District Attorney, and Leonard Joblove and Victor Barall, Assistant District Attorneys, on the brief), Brooklyn, N.Y. for Respondents–Appellees.

Before: McLAUGHLIN, JACOBS, POOLER, Circuit Judges.

POOLER, Circuit Judge.

Randolph Parsad ("petitioner") appeals from the March 29, 2002 order of the United States District Court for the Eastern District of New York (Carol Bagley Amon, *District Judge*) denying his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. We granted a certificate of appealability to determine whether the state court erred in holding that the admission of certain inculpatory statements did not violate petitioner's rights under the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For purposes of this appeal, we assume that petitioner was in custody when he made his initial, pre-*Miranda* statements and therefore assume that the detectives should have administered *Miranda* warnings earlier than they did. We hold, however, that petitioner's subsequent statements, which followed properly administered *Miranda* warnings, were both voluntary and cumulative of his initial statements. On this basis, we affirm the district court's decision.

## BACKGROUND

On the morning of June 5, 1994, in response to a 911 call, police officers discov-

ered the severely beaten body of Krzystof Minicz at an abandoned construction site. Detective Jerome Geiger, who was assigned to investigate the case, learned that Minicz was a homeless man who frequented the construction site with two other homeless men, petitioner and Robert James. Upon locating petitioner and James, who were then drinking beer and rum, Detective Geiger and three other officers identified themselves and indicated that they wished the two men to come to the 63rd Precinct station. Petitioner and James stood and walked to the officers' vehicles without speaking. The officers then drove to the station, and upon arriving at approximately 5:50 p.m., they escorted petitioner and James to separate rooms. About ten minutes later, Detective Geiger told petitioner about the investigation and asked whether he knew Minicz. Petitioner responded that "he didn't want to talk about it [and that] he didn't want to say anything." Detective Geiger then asked petitioner whether he made the 911 call, and petitioner denied making the call. Geiger testified, however, that petitioner had identified himself by name during the 911 call.

At that point, Detective Geiger left petitioner alone, uncuffed, in the unlocked squad room. The detective returned between 6:30 p.m. and 6:45 p.m. and subsequently gave petitioner coffee and food. Detective Geiger testified that petitioner was not yet a suspect, but that he was becoming a suspect. Detective Geiger, knowing that petitioner had lied about making the 911 call, continued to question him and asked whether he had fought with Minicz. Sometime before 8:00 p.m., petitioner admitted that he and Minicz fought on June 4, 1994.

At approximately 8:00 p.m., Detective Geiger again left the squad room to question James, who claimed that petitioner struck Minicz with a "two-by-four." Detective Geiger returned to the squad room and, without informing petitioner of his *Miranda* rights, asked petitioner about "what happened Sunday morning." Petitioner said that he left the construction site that morning to go to his sister's house to take a shower and change his clothes. Petitioner also said that he had been wearing a blue shirt and gave the detectives permission to retrieve it from his sister's house. Detective Douglas Hopkins went to the house, and petitioner's sister gave him a flowered print shirt with blood stains on it. Detective Hopkins then returned to the police station and asked petitioner about the blood-stained shirt. Petitioner admitted that it was the same shirt he wore when he fought with Minicz.

The detectives administered *Miranda* warnings and petitioner subsequently made a statement at approximately 9:15 p.m. Petitioner stated that he, along with Minicz and James, went to the construction site between 10 p.m. and 11 p.m. on June 4, 1994. Petitioner said that he and Minicz subsequently got into an argument, during which Minicz punched him in the stomach. Petitioner admitted that he then hit Minicz about the face and body with a piece of wood that was two to three inches wide. Petitioner also said that he punched Minicz. Petitioner said that he and James then "pushed" Minicz down to the basement of the abandoned building and went to sleep. Petitioner admitted that he placed the 911 call the next morning.

The detectives reduced petitioner's statement to writing, which he signed.[1]

---

1. Petitioner argues that Detective Hopkins did not afford him an opportunity to read the statement before he signed it.

The detectives again advised petitioner of his *Miranda* rights, and he gave another statement at 2:00 a.m., which was videotaped. Petitioner admitted in the video that he hit Minicz with a stick and then punched and kicked him. At no time during the interview was petitioner handcuffed or did he ask to leave.

When petitioner arrived at the police station, he had been wearing a pair of blue pants that had a dark stain on them. Detective Geiger testified that he was not sure whether the stain was blood, so he sent petitioner's pants to the lab for analysis. The record is unclear whether petitioner voluntarily surrendered his pants or the detectives ordered him to remove them, and exactly when petitioner removed his pants. The district court concluded only that petitioner removed his pants prior to his final statement, because the video showed him wearing a different pair of pants.

After his indictment, petitioner moved to suppress his statements, arguing that the detectives conducted a custodial interrogation without initially advising him of his *Miranda* rights. Following a suppression hearing, the trial court denied the motion while making detailed findings of fact and conclusions of law. The trial court found that petitioner and James voluntarily accompanied the officers to the police station. Specifically, the trial court found that Detective Geiger "invited" the two men "to go to the 63rd Precinct" and that the men were not placed in handcuffs. The trial court also gave "full credence" to the testimony of Detectives Geiger and Hopkins. Detective Geiger testified at the suppression hearing that he asked petitioner and James whether they would accompany the officers without indicating that they were required to do so. However, Detective Geiger also testified on direct examination that the officers "went to the

scene and ... told [petitioner that they were] going to take him to the precinct regarding Krzystof Minicz, and ... put him in the car and drove him back to the precinct." Detective Geiger also testified that since petitioner fit the description of the individual the officers sought, "[they] just took him." It is undisputed that the detectives never informed petitioner that he was not required by law to accompany them to the police station.

The trial court found that although Petitioner had been drinking when the officers initially approached him, he "seemed to understand what was going on." Specifically, the court found that "it appeared that [petitioner] had a tolerance for his drinking, which is very possible from all the drinking he had been doing over the years ...." The court also found that petitioner "was able to answer where his sister lived, he was able to state where his clothing was, that he left the clothing in the house, [and] he was able to discuss the set up of the building." The trial court concluded that "although he may have had beers and drank rum that day, when he was questioned he was not in such a state of intoxication that he could not understand what he was doing."

Petitioner went to trial, and on March 2, 1995, the jury convicted him of Murder in the Second Degree. The court sentenced petitioner to twenty years to life imprisonment. Petitioner appealed his conviction based upon the trial court's denial of his motion to suppress, and the New York Supreme Court, Appellate Division, Second Department ("Appellate Division") affirmed the ruling, concluding that petitioner had voluntarily accompanied the officers to the police station, and that he was not in custody prior to receiving *Miranda* warnings. *See People v. Parsad,* 243 A.D.2d 510, 662 N.Y.S.2d 835, 836 (2d Dep't 1997). The Appellate Division also concluded that

"[a]lthough [petitioner] had been drinking alcohol when the officers initially approached him, the evidence establishes that [he] clearly understood the reason for and purpose behind the police investigation and was able to walk and articulate appropriate responses to the detectives' questions." *Id.* at 837. However, one justice dissented on the grounds that petitioner had been in custody and that "[his] confessions were the involuntary product of a custodial interrogation conducted in the absence of constitutional safeguards." *Id.* at 838 (Friedmann, J., dissenting). A judge of the New York Court of Appeals denied petitioner leave to appeal on March 4, 1998. *People v. Parsad,* 91 N.Y.2d 944, 671 N.Y.S.2d 724, 694 N.E.2d 893 (1998).

Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, arguing that the state court erred in holding that the admission of his inculpatory statements did not violate his rights under the Fifth Amendment and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States District Court for the Eastern District of New York denied his petition on March 29, 2002. The district court held that although "the question of custody is a close one," the state court's decision that petitioner was not in custody when he made his pre-*Miranda* statements was not unreasonable, given the deferential standard of review applicable to state court adjudications under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2254. Even assuming that the pre-*Miranda* portion of the interview constituted a custodial interrogation, however, the district court held that petitioner's post-*Miranda* statements were nonetheless admissible, as they were not the product of coercion, and that the admission of petitioner's pre-*Miranda* statements was therefore harmless error.

We granted a certificate of appealability, and this appeal followed.

## LEGAL STANDARDS

### I. The Deferential Standard of 28 U.S.C. § 2254

■ We review a district court's denial of a petition for a writ of habeas corpus de novo. *See Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* 537 U.S. 909, 123 S.Ct. 251, 154 L.Ed.2d 187 (2002). Under AEDPA, the standard governing federal habeas review depends upon whether the petitioner's claims have been previously "adjudicated on the merits" by a state court. 28 U.S.C. § 2254(d); *see also Cotto v. Herbert,* 331 F.3d 217, 229–30 (2d Cir.2003). We have held that a state court "adjudicates" a petitioner's federal constitutional claims "on the merits" if "it (1) disposes of the claims on the merits and (2) reduces its disposition to judgment." *Cotto,* 331 F.3d at 229–30 (internal quotation marks omitted). *See also Ryan v. Miller,* 303 F.3d 231, 246 (2d Cir.2002).

■ In the instant case, both the trial court and the Appellate Division determined that petitioner was not in custody. Accordingly, with respect to this determination, we apply the deferential standard of review prescribed by AEDPA. Specifically, the statute provides that:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has interpreted 28 U.S.C. § 2254(d)(1) as giving independent meaning to both the "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to" Supreme Court precedent if it 1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or 2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at a contrary result. *Id.* at 405, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413, 120 S.Ct. 1495. "[C]learly established Federal law, as determined by the Supreme Court," refers to the "holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495.

 "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." *Id.; see also McKinney v. Artuz*, 326 F.3d 87, 101 (2d Cir.2003). This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility. *Cotto*, 331 F.3d at 233–34; *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1040–41, 154 L.Ed.2d 931 (2003). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. . . . A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude that decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller–El*, 123 S.Ct. at 1041. In sum, "[d]eference does not by definition preclude relief." *Id.*

Having found that petitioner was not in custody, neither the trial court nor the Appellate Division determined whether his post-*Miranda* statements were voluntary.[2] Thus, we review the record de novo to resolve this issue. *See Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir.2001).

## II. *Miranda v. Arizona* in the Context of 28 U.S.C. § 2254

 A suspect is entitled to *Miranda* warnings only if he or she is interrogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The Supreme Court has held that two discrete inquires are involved in determining whether a person was "in custody." First, we consider "the circumstances surrounding the interrogation." *Id.* at 112, 116 S.Ct. 457. As this is purely an issue of fact, *see Tankleff v. Senkowski*, 135 F.3d 235, 243 (2d Cir. 1998), we presume that the state courts' findings are correct. *See* 28 U.S.C. § 2254(e)(1). We then determine whether, given those circumstances, a reasonable person would have felt "at liberty to termi-

---

**2.** New York courts do not recognize the holding of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) that *Miranda* warnings remove the taint of coercion. *See Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir.1998) ("[T]he New York Court of Appeals has declined on state constitutional grounds to follow the rule of [*Elstad*].").

nate the interrogation and leave," which is a mixed question of fact and law. *Thompson*, 516 U.S. at 112–13, 116 S.Ct. 457; *see also Cruz v. Miller*, 255 F.3d 77, 80 (2d Cir.2001); *Tankleff*, 135 F.3d at 243.

## DISCUSSION

### I. Was Petitioner in Custody?

We first consider whether petitioner was in custody when he made his initial statement, during which he 1) lied about making the 911 call, 2) admitted that he fought with Minicz on June 4, 1994, and 3) admitted that he wore the bloody shirt that Detective Hopkins recovered from his sister's house. Petitioner made these statements before the detectives advised him of his *Miranda* rights.

The record raises concerns about the custodial nature of petitioner's encounter. The finding that petitioner voluntarily accompanied the officers to the police station is suspect, as Detective Geiger provided contradictory testimony. On direct examination, Detective Geiger testified that the officers "told [petitioner that they were] going to take him to the precinct regarding Krzystof Minicz, and . . . put him in the car and drove him back to the precinct." Detective Geiger also testified that since petitioner fit the description of the individual the officers sought, "[they] just took him."

▬ Even assuming that petitioner voluntarily accompanied the officers to the police station, whether the interview was converted into a custodial interrogation ·by virtue of petitioner surrendering his pants is a close question. Though not binding on

this Court, the New York Court of Appeals has held that a defendant was not in custody where he voluntarily removed both his pants and undershorts during questioning. *See People v. Yukl*, 25 N.Y.2d 585, 307 N.Y.S.2d 857, 861–62, 256 N.E.2d 172 (1969). Many individuals would not feel free, or even able, to leave a police station without their pants. Moreover, it is unclear whether petitioner voluntarily surrendered his pants, as Detective Geiger testified only that he "recovered" some blue trousers from petitioner's body. Although the Appellate Division concluded that petitioner was not in custody prior to receiving *Miranda* warnings, that decision is unreasonable and not entitled to deference pursuant to 28 U.S.C. § 2254(d)(2), because the majority failed to consider whether petitioner was placed in custody by virtue of the detectives' seizure of his pants. *Cf. People v. Parsad*, 243 A.D.2d 510, 662 N.Y.S.2d 835, 838 (1997) (Friedmann, J., dissenting) (dissenting partly because, "[a]t some point during the questioning, Geiger removed the defendant's blue pants" and the defendant "was partially stripped"). At the same time, however, the record reflects that the detectives provided petitioner with another pair of pants sometime prior to his videotaped statement.

Thus, even given the deferential AED-PA standard, the circumstances of petitioner's encounter with the officers raise questions concerning whether it was custodial. As our disposition of this appeal does not require resolution of this issue, however, we will assume, without deciding, that petitioner was in custody when he made his pre-*Miranda* statements.[3]

---

**3.** Although petitioner initially informed police that "he didn't want to talk about [Minicz's death]" and that "he didn't want to say anything," he has not previously argued that Detective Geiger's continued questioning in the face of his desire to remain silent constituted

an independent violation of the Fifth Amendment. *See Michigan v. Mosley*, 423 U.S. 96, 100–01, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Petitioner expressly informed the district court that he does not raise this issue as part of "a freestanding claim that in and of itself

## II. Were Petitioner's Post-*Miranda* Statements Coerced?

 Although we assume that petitioner made his initial inculpatory statements while in custody, and in the absence of *Miranda* warnings, petitioner's subsequent inculpatory statements, which occurred after the detectives advised him of his *Miranda* rights, are not necessarily inadmissible as "fruit" of the original *Miranda* violation. In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to subsequent statements that the suspect makes after receiving *Miranda* warnings. *Id.* at 314, 105 S.Ct. 1285. Rather, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it [was] knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. 1285. Therefore, we must consider whether the circumstances surrounding petitioner's unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his post-*Miranda* confession. *See id.* at 309–14, 105 S.Ct. 1285; *see also Tankleff,* 135 F.3d at 244. While all custodial interrogations inherently involve "serious pressures," *id.*, in determining the voluntariness of petitioner's post-*Miranda* confessions, we must examine the totality of the circumstances. *See Tankleff,* 135 F.3d at 245. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police. *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991).

Petitioner argues that his pre-*Miranda* statements were involuntary because he was an alcoholic and had been drinking prior to his interrogation. However, the trial court made detailed findings of fact on this issue. The court found that petitioner "seemed to understand what was going on," as he was able to answer the officers' questions coherently. The trial court also found that "although [petitioner] may have had beers and drank rum that day, when he was questioned he was not in such a state of intoxication that he could not understand what he was doing." The Appellate Division concluded that "[a]lthough [petitioner] had been drinking alcohol when the officers initially approached him, the evidence establishes that [he] clearly understood the reason for and purpose behind the police investigation and was able to walk and articulate appropriate responses to the detectives' questions." *Parsad,* 662 N.Y.S.2d at 837.

 Petitioner challenges the state courts' findings, arguing that Detective Geiger testified that petitioner was "intoxicated." However, the detective refused to characterize petitioner as being drunk:

Q: And when you come upon them, would it be fair to say that both of them were intoxicated?

A: I would say they were drinking, yes, sir.

Q: All right. Well, again—were they drunk?

---

entitles [him] to suppression of all statements." Rather, petitioner argued only that Detective Geiger's failure to acknowledge his intention to remain silent meant that he was not, in fact, free to terminate the session and leave the police station. Accordingly, to the extent petitioner's brief asserts an independent claim based upon the detective's failure to honor his request to remain silent, we decline to consider it. *See Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

A: I don't know, sir. I don't know the gentlemen's' level how alcohol they could take. [sic]

Accordingly, petitioner cannot demonstrate that the state courts' findings on this issue are clearly erroneous, the standard we apply in our de novo review of an issue that the state courts left unresolved. The mere fact that petitioner is an alcoholic is insufficient to render his pre-*Miranda* statements involuntary.

■■■ The conditions of petitioner's interrogation were not so coercive as to render his post-*Miranda* statements involuntary. Upon arriving at the police station at approximately 5:50 p.m., the detectives escorted petitioner to the squad room, where he sat in a "sofa-chair," and not to an interrogation room. The room was unlocked throughout the interrogation, and the detectives did not handcuff petitioner prior to his actual arrest. Moreover, the detectives did not subject petitioner to extended periods of questioning without interruption. Upon arriving at the police station, the detectives talked with petitioner for approximately ten minutes. Afterwards, the detectives left him alone in the squad room until 6:30 p.m. to 6:45 p.m., when they brought him some coffee and food. The detectives resumed the questioning, and before 8:00 p.m., petitioner admitted to fighting with Minicz on the day in question. Shortly after 8:00 p.m., petitioner informed the detectives that he had gone to his sister's house after the fight to shower and change his clothes, and he gave them permission to retrieve his clothes. Approximately one hour later, at 9:15 p.m., petitioner admitted to wearing the bloody shirt that Detective Hopkins recovered from his sister's house. Thus, prior to receiving *Miranda* warnings, petitioner was at the police station from 5:50 p.m. to 9:15 p.m., and the detectives questioned him only intermittently. Based upon the atmosphere of the interrogation, we cannot conclude that petitioner's pre-*Miranda* statements were coerced.

■■■ Finally, petitioner does not establish that the detectives employed coercive or improper tactics during their interrogation. Petitioner argues that the detectives ignored his initial statement that he did not wish to say anything concerning Minicz's death. The mere fact that police officers improperly question a suspect after he invokes his right to remain silent during a custodial interrogation does not render his subsequent statements the product of coercion. Rather, the Supreme Court recognizes that such statements may, in fact, be voluntary. For example, statements taken in violation of *Miranda*, though inadmissible as part of the prosecution's case-in-chief, are nevertheless admissible for impeachment purposes where they are also voluntary and uncoerced. *See Oregon v. Hass*, 420 U.S. 714, 722–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Whether statements taken in violation of *Miranda* are the product of coercion entails an analysis that goes beyond the mere fact that the statement violates *Miranda*. *Compare Hass*, 420 U.S. at 722, 95 S.Ct. 1215 (holding that statements taken in violation of Miranda are admissible for impeachment purposes where "the trustworthiness of the evidence satisfies legal standards" (internal quotation marks omitted)), *with Mincey v. Arizona*, 437 U.S. 385, 399–402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (holding that statements taken in violation of *Miranda* are not admissible for any purpose where they were involuntary or the product of coercion). Thus, the mere fact that a police officer takes a statement after a suspect invokes his right to remain silent does not, standing alone, ren-

der that statement the product of coercion.[4]

Petitioner argues that the detectives were increasingly hostile towards him, as they accused him of lying and confronted him with evidence linking him to the crime. However, petitioner's initial representations were contradicted by the evidence. For example, although petitioner initially denied making the 911 call, he identified himself by name during that call. Petitioner also told the detectives that he wore a blue shirt on the day he fought with Minicz, but his sister gave Detective Hopkins a flowered shirt. Therefore, the detectives were reasonable in exposing these inconsistencies and asking petitioner to explain them. Regardless, all custodial interrogations inherently involve pressure, and officers routinely confront suspects with incriminating evidence. Although such conduct, if excessive, could render a suspect's confession involuntary, we find that petitioner's statements were not the product of coercion.

Petitioner also contends that the police officers mistreated him. In his videotaped statement, petitioner alleged that "a detective had punched him in the right eye and tried to force him to talk." Petitioner also argues that the detectives mistreated him by seizing his clothes. There is no evidence, however, that the detectives assaulted petitioner. During the videotaped statement, the detectives "zoomed in" on petitioner's face, and his eyes showed no indication of abuse. Even assuming that the officers seized petitioner's pants without his consent, the record is clear that

they provided him another pair of pants. Accordingly, we cannot conclude that the detectives mistreated petitioner in an effort to coerce a confession.

In sum, the totality of the circumstances surrounding petitioner's interrogation do not suggest that his statements to the police were involuntary. Therefore, we presume that the state courts' findings that petitioner was competent to be interrogated, and that neither the conditions of the pre-*Miranda* portion of the interrogation nor the detectives' corresponding actions were unlawfully coercive, are correct.

### III. Was the Error Harmless?

Having assumed that petitioner was in custody, we must also assume that the trial court erred in admitting petitioner's initial inculpatory statements, as the detectives had not yet informed him of his *Miranda* rights. We conclude, however, that the error was harmless, as petitioner's post-*Miranda* statements, which we have held were properly admitted, were cumulative of his pre-*Miranda* statements. *See Campaneria v. Reid,* 891 F.2d 1014, 1022 (2d Cir.1989).[5]

 Prior to receiving *Miranda* warnings, petitioner admitted that he fought with Minicz on June 4, 1994. In both his written and videotaped statements, petitioner admitted to fighting with Minicz on the day in question and described the fight in greater detail than he did in his pre-*Miranda* statements. The trial court gave "full credence" to Detective Hopkins's testimony that petitioner admitted during his first post-*Miranda* statement that he beat Minicz "about the face and body" with "a

---

**4.** That is not to say, however, that police officers may freely disregard a suspect's exercise of his right to remain silent during a custodial interrogation. As discussed, petitioner did not raise such a claim before the district court.

**5.** We find that the error was harmless, regardless of whether the *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) or the *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) standard of review applies to post-AEDPA habeas cases. *See Ryan,* 303 F.3d at 253–54.

piece of wood." According to Detective Hopkins, petitioner admitted that he then beat Minicz with his fists and dragged him "head first" down to the basement of the building. During the subsequent video-taped statement, petitioner stated that he pushed Minicz, who fell and hit his head on a foundation block. Moreover, petitioner again admitted to striking Minicz with a stick and then punching and kicking him.[6]

Petitioner also stated prior to receiving *Miranda* warnings that he went to his sister's house the morning after the fight to shower and change his clothes. After the detectives retrieved petitioner's clothes, he admitted that he had been wearing the bloody shirt on the day he fought with Minicz. In his videotaped statement, petitioner reiterated that he had gone to his sister's house after the fight to shower and change his clothes, and he again stated that he had been wearing a flowered shirt. It is unclear whether petitioner, after receiving *Miranda* warnings, admitted to wearing the particular shirt that Detective Hopkins recovered from his sister's house. This would not entitle petitioner to relief, however, given his admission that he beat Minicz and the fact that the prosecution could have linked him to the shirt without his express admission to having worn that particular shirt.

### CONCLUSION

Based upon the foregoing, the judgment of the United States District Court for the Eastern District of New York is affirmed.

**6.** Petitioner argues that the videotaped statement was not cumulative of his pre-*Miranda* statements because he stated in the video that he hit Minicz only once with a stick. However, according to Detective Hopkins, petitioner admitted during his written post-*Miranda* statement that he beat Minicz with a piece of wood. Regardless, a single discrepancy concerning the number of times petitioner hit Minicz with a stick is insufficient to warrant relief, given the voluminous and inculpatory nature of his remaining post-*Miranda* statements.