OPINION OF THE COURT
Joseph Kevin McKay, J.
The court makes the following findings of fact and conclusions of law after an evidentiary hearing held on March 23, 24, and April 7, 14, 2004 on defendants’ motions to suppress statements. Sometime after the hearing defendant Curtis Babb withdrew his motion to suppress the statements he made to the detectives on June 22, 2002 in the 77th Precinct. Therefore, I will not make findings and conclusions in his case, but I will make occasional references to him to complete the narrative.
The People’s witnesses, Detective Panichi and Detective Polacsek, were truthful but not completely reliable in many respects because their hurried investigation on the night of June 21 and early morning of June 22, 2002 seemed superficial and their record keeping and reporting inadequate. Given that situation, their frequent memory lapses were probably inevitable.
Police Officer Augustin, on the other hand, called by the defense, was also truthful but I believe more reliable about her hospital interviews and she had a better memory than the detectives concerning the narrow part of the case in which she was involved.
Complaining witness Charmaine Babb, on June 21, 2002, was admitted to Bungs County Hospital (KCH) with burns to her feet and, as far as the detectives understood, some undefined vascular problems in her legs, after being found alone in her wheelchair in a dazed, helpless and disheveled condition in a locked church located at 702 St. Marks Avenue in Brooklyn. She had been missing for several days from the Park Terrace Rehabilitation Center, where she was a long-term resident following a stroke she suffered while giving birth a year or so earlier.
Sergeant Curtis Josephs, who was called to testify by defendant Junior Mitchell, was the patrol supervisor at the 77th Precinct for the 4:00 p.m. to midnight tour of duty on June 21, 2002. He sent Augustin to KCH to investigate Ms. Babb’s situation. Augustin interviewed Ms. Babb and others at the hospital and reported back to Sergeant Josephs that Ms. Babb was seriously injured during a religious healing ritual. The sergeant *265 then referred the case to the detectives in the 77th Squad and directed Augustin to resume patrol after she briefed the detectives who were coming to KCH. Augustin was called by defendant Junior Mitchell, the shepherd of the church, to testify about details of her hospital interviews and the preparation of a UF-61 naming Junior Mitchell as “Wanted” in the assault, first degree, case involving Ms. Babb. She received and provided to the court much more detail regarding the incident, including some allegations about what Curtis Babb did during the ceremony which are not relevant to these findings. It was not clear how much of that information was relayed to the detectives that night. They recalled very little.
The detectives went to KCH and conducted a short interview with Augustin, as well as with a health attendant from Park Terrace and with Ms. Babb herself. At the hearing only sparse details of their interviews were given, mostly based on their notes and reports. The detectives recalled seeing Ms. Babb’s toes badly burned and her wincing with pain. They learned that Ms. Babb went willingly to the church on or about June 9, 2002 for a healing ritual involving extended fasting and prayer conducted by shepherd Junior Mitchell, assisted by his wife Desrein Mitchell, the pastor of the church. At some point Junior Mitchell burned Ms. Babb’s feet with candle wax and fire and at another point he used a razor to cut an “x” on the bottom of her feet, letting out blood and water. At yet another time Desrein Mitchell used a broom to hit her legs. She also complained that she was denied necessary medical attention.
The detectives, accompanied by a number of other police officials and vehicles, went to the church in question that same night, June 21, 2002. They were allowed upstairs to adjoining living quarters for Junior and Desrein Mitchell. The detectives told the Mitchells that they needed to interview them that night at the precinct about a ceremony in the church during which Ms. Babb was burned. The Mitchells were given a chance to get dressed in the next room. They were not cuffed or formally arrested, but neither were they given other options, such as to be interviewed at their home, or the next morning or at some other more convenient time and place. Here again, the detectives remembered virtually nothing that was not in their notes or reports. For example, they could not say which other police officials or vehicles accompanied them, who answered the door, what, if any, specific conversation was engaged in, or which defendant rode in which police vehicle. They all went to the 77th *266 Precinct for the interrogations. The one memory exception, which I credit, is that Detective Panichi recalled that Junior Mitchell on the way to the precinct asked him if he was under arrest and Panichi said “No.”
At the precinct Desrein and Junior Mitchell were put in separate rooms to be interrogated. No Miranda warnings were given until much later. During the approximate one-hour separate sessions, each gave statements. Notes were taken by the detectives and DOS’s were prepared, but nothing was written, recorded or signed by the Mitchells themselves.* I believe the questioning was intended to elicit information and also took on a challenging or accusatory tone at times.
After these interviews and after conferring with his partner and probably supervisors, Detective Polacsek determined to make formal arrests of Junior and Desrein Mitchell and gave them Miranda warnings separately at about 3:45 a.m. and 3:46 a.m., respectively, on June 22. They each declined to make any further statements to the detectives or to an assistant district attorney on video.
None of the defendants testified at the hearing. As previously noted, Junior Mitchell called Augustin and Sergeant Josephs to elicit more facts about the hospital interviews and the police action taken in response to information gained from their interviews. The sergeant acknowledged authoring a report to the chief of patrol that night wherein he wrote that Junior Mitchell was “being held for investigation by Det. Polacsek.” In addition to giving details not supplied by the detectives from Ms. Babb, Augustin testified that the duty captain that night asked her if she wanted to accompany the detectives to the church to make an arrest. While I accept the fact that she was told this, I also find that the detectives remained in charge of this investigation and were not ordered to make formal arrests by any supervisors, at least not before they interviewed those subjects from the church. In addition, I find that although the detectives believed they had enough information, amounting in their view to probable cause, to make arrests of the Mitchells that night, they did not begin the formal arrest process until after the questioning sessions which are the subject of this hearing.
*267 Conclusions of Law
The People must prove voluntariness of defendants’ statements beyond a reasonable doubt. (People v Huntley, 15 NY2d 72 [1965]; People v Holland, 48 NY2d 861 [1979].) This burden includes the prosecution’s duty to prove beyond a reasonable doubt that defendants were given and knowingly and voluntarily waived their Miranda rights, if they were subjected to custodial interrogation. (People v Rosa, 65 NY2d 380 [1985]; Miranda v Arizona, 384 US 436 [1966].)
However, regarding the threshold issue of custody, i.e., whether defendants were in custody for purposes of requiring Miranda warnings before their interviews or interrogations, the case law is by no means uniform. Some courts have held that the defense has the ultimate burden of persuasion by a preponderance of evidence that the defendants were in custody. (See, Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 710.60, at 281 [1995], citing United States v Charles, 738 F2d 686 [5th Cir 1984]; see also, People v Morales, NYLJ, Dec. 8, 1997, at 30, col 4 [Sup Ct, NY County 1997], affd 281 AD2d 182 [1st Dept 2001], lv denied 96 NY2d 922 [2001]; People v Payne, 1 Misc 3d 909[A], 2004 NY Slip Op 50010[U] [Sup Ct, Kings County 2004] [and cases cited therein]; People v Holder, NYLJ, Sept. 20, 1991, at 27, col 1 [Sup Ct, Kings County 1991].)
Other courts have followed a different rule and placed the burden on the prosecutor to disprove custody, either beyond a reasonable doubt (see People v Tirado, 137 AD2d 928 [3d Dept 1988], lv denied 71 NY2d 974 [1988]; People v Walsh, 1996 WL 639850 [Sup Ct, NY County, Oct. 31, 1996]; see also 1 CJI[NY] 11.02, at 661-665 [1983]) or by some undefined or lesser standard (see People v Flores, NYLJ, Oct. 19, 1981, at 5, col 1 [App Term]; People v Knight, NYLJ, Dec. 15, 1992, at 22, col 3 [Sup Ct, NY County]).
The ambiguity in the case law regarding this burden of proof is further illustrated by the First Department’s introductory language in its affirmance of Morales (supra at 182): “Regardless of which party is deemed to have the burden of proof on the issue of custodial interrogation.” Moreover, this issue has not been definitively decided by the Court of Appeals. (See, People v Alls, 83 NY2d 94, 113 [1993] [Simons, J., dissenting], cert denied 511 US 1090 [1994].)
Defendant Junior Mitchell’s posthearing brief urges this court to follow a different line of cases dealing with the People’s *268 burden of proving consent: People v Gonzalez (39 NY2d 122 [1976]), People v Dodt (61 NY2d 408 [1984]) and People v Gonzalez (80 NY2d 883 [1992]). Those cases each require the prosecution to bear the heavy burden of establishing consent in different factual and legal contexts, when the prosecution claims that consent was given and it forms an essential part of the prosecution’s case for a waiver of a constitutional right. (See, Marks, Dean, Dwyer, Gírese and Yates, New York Pretrial Criminal Procedure § 10.20, at 621 n 481 [7 West’s NY Prac Series 1996].)
In the final analysis it appears to me that People v Gonzalez (80 NY2d 883 [1992]) is controlling on the question of which side has the burden of proving custody or lack of it in cases such as ours, where the issue turns on whether consent was given to go to the precinct for questioning. The prosecution bears that burden by clear and convincing evidence. While it is tempting to reconcile the line of cases referred to previously which place the burden on the defense, by ruling that the prosecution’s burden is merely one of going forward, I cannot do so without disregarding the Court of Appeals’ reliance on People v Gonzalez (39 NY2d 122, 128 [1976]) and People v Dodt (61 NY2d 408, 417 [1984]). (See, People v Gonzalez, 80 NY2d 883, 885 [1992].)
Having resolved the burden of proof issue, I turn now to the issue of custody itself. Courts remain unanimous that the rule in People v Yukl (25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970]) still governs, even in cases where the custody issue is chiefly determined by whether consent by the subject to go to the police station was given. “The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position.” (Id. [citations omitted]; see, People v Diaz, 84 NY2d 839 [1994]; People v Centano, 76 NY2d 837 [1990], habeas corpus denied sub nom. Centono v Garvin, 1999 WL 118124, 1999 US Dist LEXIS 2559 [SD NY, Mar. 5, 1999]; People v Parsad, 243 AD2d 510 [2d Dept 1997], lv denied 91 NY2d 944 [1998]; People v Delfino, 234 AD2d 382 [2d Dept 1996], lv denied 89 NY2d 1034 [1997]; People v Nolcox, 190 AD2d 824 [2d Dept 1993], lv denied 81 NY2d 1017 [1993]; People v Smedman, 184 AD2d 600 [2d Dept 1992]; People v Forbes, 182 AD2d 829 [2d Dept 1992], lv denied 80 NY2d 895 [1992]; People v Bailey, 140 AD2d 356 [2d Dept 1988]; People v Johnson, 91 AD2d 327 [4th Dept 1983], affd 61 NY2d 932 [1984].)
*269 Mitchell is virtually indistinguishable from People v Gonzalez (80 NY2d 883 [1992]). True, the prosecution in Gonzalez (supra) presented no firsthand evidence of the circumstances under which defendant was brought to the precinct and the defendant’s wife testified at the hearing to the threat of force expressed by the detectives. In contrast, the hearing record in Mitchell included the testimony of two detectives who went to the church to pick up the Mitchells. Upon further scrutiny, however, this appears to be a difference without distinction. Aside from the fact that a number of police officials were present at the church that night, at least one of whom was reliably quoted at the hearing as having said that an arrest was about to be made, the detectives remembered almost nothing about the circumstances of encountering the Mitchells and bringing them to the precinct for questioning that night. This is hardly the way to carry a heavy burden. The one exception, that Junior Mitchell asked in the police car if he was under arrest and was told “No,” cuts both ways. It demonstrates not only that the subject of arrest was on Junior Mitchell’s mind, but also that the circumstances he found himself in with the police naturally led him to make that inquiry and feel that pressure. Nor does the negative answer he was given change my conclusion. The formal arrest was not yet effected and the detectives intended to postpone that process until after the interrogations in an obvious effort to facilitate the interrogations themselves and, in their view, to obviate the need for Miranda warnings. Formal arrest necessarily includes custody, but custody does not require formal arrest.
Assume that reasonable persons in the place of the Mitchells, innocent of any crime, but probably aware that Ms. Babb had suffered injury, possibly serious, during or after (but in some way related to) an extended religious healing ritual they conducted in their church, were visited by a number of police officials and vehicles in the middle of the night, roused from sleep and told they were needed for questioning immediately at the precinct. Such reasonable and innocent persons may very well believe themselves to be in custody on their way to and at the precinct, i.e., that they had no choice but to go with the police, depending on what the police said to them and how the police conducted themselves that night, especially at the Mitchells’ home. The absence of clear proof by the prosecution regarding those circumstances renders the record ambiguous on the critical issue of their voluntary cooperation with the police that *270 night. Given my ruling on the burden of proof, that ambiguity must be resolved against the People.
I therefore conclude that the People have not carried their heavy burden of proof regarding the Mitchell deféndants’ consent to be interrogated at the precinct (People v Yukl, supra), and that, on this record, their statements were the product of custodial interrogation without the required Miranda warnings. Accordingly, the motions to suppress their statements are granted, and the statements are suppressed. They may, however, be introduced for impeachment purposes, if appropriate, on cross-examination or on rebuttal, since they were not classically coerced. (See, Harris v New York, 401 US 222 [1971].)

 Curtis Babb, husband of Ms. Babb, arrived at the precinct some time after the Mitchells. The detectives cannot explain how or why he got there. He was separately interviewed after the Mitchells and allowed to leave the precinct. Curtis Babb was not arrested and charged until approximately two months later.